OPEN AMERICA, et al.

v.

The **WATERGATE SPECIAL PROSECUTION FORCE, et al., Appellants.**

No. 76–1371.

United States Court of Appeals, District of Columbia Circuit.

Argued 27 April 1976.

Decided 7 July 1976.

---

Eloise E. Davies, Potomac, Md., with whom Leonard Schaitman, Washington, D. C., was on the motion, for appellants.

Alan B. Morrison, Washington, D. C., was on the motion for appellees.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion filed by Circuit Judge LEVEN-THAL concurring in the result.

WILKEY, Circuit Judge:

Action in the District Court was brought to compel disclosure within certain specified time limits of information sought under the Freedom of Information Act (FOIA).[1] In contrast with previous Freedom of Information Act cases, this suit does not deal with an interpretation of any of the exemptions to disclosure, but with the question of the time within which any compliance with or denial of a request must be made, as set forth in the 1974 FOIA amendments.[2] Ultimate access to the records is not, and may never be, the issue; the issue is under what time constraints administrative agencies

---

1. 5 U.S.C. § 552 (1970 & Supp. IV, 1974).

2. Act of 21 November 1974, Pub.L. No. 93–502, § 1(c), 88 Stat. 1561, *amending* 5 U.S.C. § 552(a) (1970).

should be compelled to act by a court at the behest of an information seeker.

United States District Judge Aubrey Robinson granted plaintiffs' motion under *Vaughn v. Rosen*[3] to require detailed justification, itemization, and indexing of the documents within thirty days. Believing that the statutory interpretation urged by plaintiffs and upon which the District Judge acted is erroneous, we reverse.

## I. THE STATUTORY INTERPRETATION ISSUE

### A. *Actions Taken by the Parties*

Plaintiffs' request under the Freedom of Information Act was made on 10 October 1975 by identical letters to the Attorney General of the United States, the Director of the FBI, and others, demanding the production for inspection and copying of all documents and files relating to the role of the former Acting Director of the FBI, L. Patrick Gray, in any aspect of the so-called "Watergate affair." These letters admonished that "[f]ailure to reply to this request within the ten-day period provided by the Act will be treated as a denial of the request, and appeal will be sought."[4] Reply was made by the Director of the FBI on 5 November 1975, noting that the request had been received, and that on the day of receipt the FBI had 5,137 Freedom of Infor-

mation Act requests on hand and was in various stages of completion on 1,084 of those cases.[5]

By letter of 12 November 1975 plaintiff Open America addressed an appeal to the "Appeals Officer, Freedom of Information Unit, Federal Bureau of Investigation," noting that "[i]f you do not act upon my request within 20 working days, I will deem our request denied."[6] On reaching its proper destination this letter, too, was duly acknowledged, the reply pointing out that the request had been assigned its priority number and would be processed in due course. Without detailing further exchange of correspondence between plaintiffs and officials of the Justice Department, it is sufficient to note that the failure of the FBI to complete the processing of this request within the statutory time limits, as interpreted by the plaintiffs, resulted in the filing on 22 January 1976 of the action in the District Court seeking to compel the FBI to comply with or deny immediately plaintiffs' request.

After plaintiffs obtained such an order, the Government defendants came to this court, seeking an immediate temporary stay of the District Court's order of 23 March 1976.[7] At oral argument all parties stated that they had no objection to the court considering this case on the merits, which we have done.[8]

---

**3.** 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). *See also Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975).

**4.** Memorandum in Support of Government's Motion for Stay Pending Appeal (Exhibit A). Plaintiffs' letter, signed by John F. Banzhaf, III, as Executive Director, and four other individuals as Directors, of Open America, states that "Open America, Inc., is a non-profit organization formed to undertake projects 'in the public interest,' and this request is part of such a project."

**5.** *Id.* (Exhibit B).

**6.** *Id.* (Exhibit C). This was an incorrect address, as the Appeals Office is located within the Office of the Deputy Attorney General.

**7.** This action originally named the Watergate Special Prosecution Force as the first defend-

ant. Judge Robinson's order noted that this entity planned to file a detailed justification as to the two files in its possession requested by plaintiffs. Hence, plaintiffs' motion was granted only "as to Defendants Attorney General Levi, Director Kelley, Department of Justice and Federal Bureau of Investigation. . . . ." *Open America v. Watergate Special Prosecution Force*, Civil Action No. 76–0129 (D.D.C., order issued 23 Mar. 1976).

**8.** The District Court's order is reviewable under 28 U.S.C. § 1292(a) (1970). *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 169–72, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The order settled conclusively the position of the parties under 5 U.S.C. § 552(a)(6)(C) (1970), whose construction, in light of the circumstances in this and other cases, is too important to be denied review. The question of priorities should be de-

### B. *Plaintiffs' Theory of the Case*

█ At no time have plaintiffs specified the purpose for which they desire access to the FBI files on the role of L. Patrick Gray in the Watergate affair, nor indeed under the Freedom of Information Act are they required to do so. More important to the issue in this appeal, however, may be that at no time have plaintiffs specified any urgent or exceptional need for this information which entitles them to a priority over the other 5,137 applicants whose requests under the Freedom of Information Act were on file with the FBI on the date plaintiffs' request was received. Rather, plaintiffs have relied throughout on a claim of absolute right to have their request processed within the statutory ten-day and twenty-day periods.[9]

It is apparent from the action of the District Judge on this matter that he adopted completely plaintiffs' theory of the case. He held no hearing, he made no findings of fact, he gave no reasons for his action in granting plaintiffs' motion; he simply issued an order for the defendant officials to deliver to plaintiffs within thirty days the documents agreed to be produced and a detailed justification for documents claimed to be exempted from disclosure under the FOIA. We accept these actions of the District Judge to mean that he agreed with plaintiffs' interpretation of the statute, and that in the spirit of expediting all Freedom of Information Act requests, he saw no reason to delay matters by holding a hearing or taking the time to make detailed findings of fact or to elaborate upon his reasons. If the matter were as simple as plaintiffs claim it to be, and as the District

Judge appeared to assume, this was a sensible course of action.

### C. *The Statutory Language*

This is a case of first impression. There are no previous judicial decisions interpreting 5 U.S.C. § 552(a)(6)(A), that portion of the 1974 amendments on which plaintiffs base their argument and on which the District Judge acted.[10] We must therefore base our decision on the original Freedom of Information Act, the amendments of 1974, their legislative history, and the undisputed operative facts of this case, with scant resort to precedent.

Section 552(a) of Title 5, United States Code, was amended by adding:

(6)(A) Each agency, upon any request for records . . . shall—

(i) determine within ten [working] days . . . after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination . . . .

(ii) make a determination with respect to any appeal within twenty · [working] days . . . after the receipt of such appeal.

These "administrative deadlines" of Section 552(a)(6)(A) are modified by the following subparagraph (B), which provides that in "unusual circumstances," for example where the request involves voluminous records, or records must be obtained from field office or storage, the total time limits may be extended for an additional ten working days. Thereafter, an applicant who has not received either the information requested or denial of his request will be

---

cided now, not on an appeal from the Government's probable claim under exemptions to disclosure, when the issue of priorities might appear moot.

**9.** 5 U.S.C. § 552(a)(6)(A). There is some indication that the individual plaintiffs, a law professor and students at a local law school, are desirous of making this a test case on subsection (a)(6)(A). Accordingly, they have not alleged any facts which would bolster their claim, preferring instead to rely on the bare words of the statute in an effort to secure a

decision favorable to the meaning they ascribe to it.

**10.** Since issuance of the order in the instant case, two other federal district courts for the District of Columbia have interpreted section 552(a)(6)(A), (along with subparagraph (C)) and reached opposite conclusions. *Compare Hayden v. United States Dep't of Justice,* Civil Action No. 76–0288, 413 F.Supp. 1285 (D.D.C., 1976) (Bryant, J.), *with Cleaver v. Kelley,* Civil Action No. 795–76, 415 F.Supp. 174 (D.D.C., 1976) (Green, J.).

deemed to have exhausted his administrative remedies (subparagraph (C)), and may then bring suit in the appropriate district court pursuant to Section 552(a)(4)(B).

The specific language of the 1974 amendments on which the Government relies appears in 5 U.S.C. § 552(a)(6)(C): "If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records."

## II. PRESENT FBI PROCEDURES COMPARED TO THE STATUTE

The Government defense, simply put, is that the FBI has indeed exercised "due diligence" in handling all informational requests, including this one, but that "exceptional circumstances" created by a virtual deluge of requests since the effective date of the FOIA amendments have prevented the agency from completing its review of the records sought by these and other applicants. Thus, defendants assert, under such circumstances Congress intended for the courts to utilize the authority granted them by subsection (6)(C) to relieve agencies of the burden of complying with the very strict statutory time limitations in subsection (6)(A). The "exceptional circumstanc-

es" provision was designed and inserted specifically as a safety valve for the new statute.

### A. *"Exceptional Circumstances"*

Subparagraphs (B) and (C) of Section 552(a)(6) both contain escape valves of a sort. (B) refers to "unusual circumstances," but only such unusual circumstances as are specified in this subparagraph will suffice for a ten-day extension of the limits of subparagraph (A). Those unusual circumstances are the need to collect the records from several separate places, voluminous records called for in the single request, and a need for consultation with other agencies. The ten-day extension is granted by the agency to itself, but only on notice to the requesting party.

■ The "exceptional circumstances" of subparagraph (C) are something different. "If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records." This was put in as a safety valve after the protests of the administration that the rigid limits of subparagraphs (A) and (B) might prove unworkable.[11] Subparagraph (C) obviously contemplates (1) that the agency

---

11. The Senate Report on the 1974 FOIA amendments explains,

> [T]he time limits set in section [552(a)(6)] will mark the exhaustion of administrative remedies, allowing the filing of lawsuits after a specified period of time, even if the agency has not yet reached a determination whether to release the information requested. Where there are "exceptional circumstances," the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Such "exceptional circumstances" will not be found where the agency had not, during the period before administrative remedies had been exhausted, committed all appropriate and available personnel to the review and deliberation process. This final court-supervised extension of time is to be allowed where the agency is clearly making a diligent, good-faith effort to complete its review of requested records but could not practically meet the time deadlines set . . . . .

Joint Comm. Print, Freedom of Information Act and Amendments of 1974 (P.L. 93–502), 94th

Cong., 1st Sess. 178 (1975) (hereinafter "Leg. Hist."). Both subsections (a)(6)(B) and (a)(6)(C), which initially appeared only in the Senate version of the bill, were included in the final conference bill (the version enacted) in an effort to meet objections raised by the administration to the strict time limitations of subsection (a)(6)(A). President Ford had advised the conferees that he

> believe[d] that the time limits for agency action [were] unnecessarily restrictive in that they fail[ed] to recognize several valid examples of where providing flexibility in several specific instances would permit more carefully considered decisions in special cases without compromising the principle of timely implementation of the Act.

Legis.Hist. at 380.

The Conference Chairmen, Senator Kennedy and Congressman Moorhead, sent the following reply to the President:

> You . . . suggest that the time limits in the amendments may be unnecessarily restrictive. The conference adopted at the first

will have found it impossible to respond to a request within the time limits specified, even with all due diligence, and for reasons not confined to those listed in subparagraph (B); [12] (2) that the requesting party will have gone to court; and (3) that the court

> meeting the Senate language allowing agencies an additional ten days to respond to a request or determine an appeal in unusual circumstances. Pursuant to your suggestion we included language from the Senate version making clear that a court can give an agency additional time to review requested materials in exceptional circumstances where the agency has exercised due diligence but still could not meet the statutory deadlines.

Legis.Hist. at 382.

The president vetoed the bill, stating in his veto message a concern that, given the amendment's time frame, law enforcement agencies would be so overburdened with the review of FOIA requests that they could not effectively perform their law enforcement duties:

> . . . I believe that confidentiality would not be maintained if many millions of pages of FBI and other investigatory law enforcement files would be subject to compulsory disclosure at the behest of any person unless the Government could prove to a court—separately for each paragraph of each document—that disclosure "would" cause a type of harm specified in the amendment. Our law enforcement agencies do not have, and could not obtain, the large number of trained and knowledgeable personnel that would be needed to make such a line-by-line examination of information requests that sometimes involve hundreds of thousands of documents, within the time constraints added to current law by this bill.
>
> Therefore, I propose that more flexible criteria govern the responses to requests for particularly lengthy investigatory records to mitigate the burden which these amendments would otherwise impose, in order not to dilute the primary responsibilities of these law enforcement activities.

Legis.Hist. at 484.

Senator Kennedy, a sponsor of the 1974 amendments, explained in the Senate debate following the veto that subsection (a)(6)(C) was designed to provide an "escape valve" for agencies that are diligently trying to review requested materials, but are unable, because of "exceptional circumstances," to complete their work before a complaint is filed in district court:

> [T]here is the issue of time limits. Our bill provides an agency 10 working days to respond initially to a request for information, 20 working days on appeal, and an additional 10 working days where unusual circumstances are present. That gives the agency 40 working days, or almost two calendar months—more than enough time for any agency to complete the process of finding and reviewing requested documents.

> If a person sues the agency after that time, and the agency is still diligently trying to complete review of the materials under exceptional circumstances, then we have another escape valve in the bill—added by specific request of the administration during our conference. The agency may ask for, and the court is authorized to grant, additional time pending completion of such review.

Legis.Hist. at 438–39. Similarly, Senator Bayh, another sponsor of the bill, explained,

> [T]he bill permits a court in exceptional circumstances to delay its review of a case until an agency has had sufficient time to review its records. In other words, after the 2 months of administrative deadlines have lapsed and after a complaint has been filed with the court, the court still has the discretion to grant the agency more time if exceptional circumstances warrant. These provisions more than adequately satisfy the President's concern for flexibility.

Legis.Hist. at 471. During the post-veto debates on the other side of Capitol Hill, Congressman Moorhead also alluded to the "safety valve" aspect of subsection (a)(6)(C):

> . . . Mr. Speaker, we . . . include language requested by the President in his August 20 letter to the conference committee [quoted in part supra] to authorize the courts to grant a Federal agency additional time to respond to a request under the Freedom of Information Act if the agency is "exercising due diligence in responding to the request." Here again the veto message ignores specific language already included in the bill.

Legis.Hist. at 407.

12. We do not rule out the possibility that an extraordinary factor or a combination of reasons listed in (6)(B) might constitute "exceptional circumstances" under (6)(C). (B) is a safety valve for the agency and is limited in time and cause; (C) is a safety valve to be opened only by a court after an objective evaluation of the exceptional circumstances and a showing of due diligence by the agency. As previously noted, two federal district courts for the District of Columbia have reached opposite conclusions on the meaning of "exceptional circumstances." Compare Hayden v. United States Dep't of Justice, Civil Action No. 76-0288, 413 F.Supp. 1285 (D.D.C., 1976) (Bryant, J.), with Cleaver v. Kelley, Civil Action No. 795-76, 415 F.Supp. 174 (D.D.C., 1976) (Green, J.).

will hear evidence (a) as to what "exceptional circumstances" may excuse the Government from the rigid time limits of subparagraphs (A) and (B), and (b) as to the "due diligence" of the agency, if that is challenged by plaintiff.

That such safety valve might well have been contemplated and is presently needed is evidenced by the fact that Congress appropriated no additional resources whatsoever for implementation of the 1974 FOIA amendments, but instead contemplated that any additional costs could be absorbed within the operating budgets of the agencies. The House Committee on Government Operations estimated the total additional cost of the FOIA amendments *for all* agencies at $50,000 for 1974 and $100,000 for each of the succeeding five years.[13] The cloudy state of the Congressional crystal ball is demonstrated by an FBI official's affidavit filed in these proceedings: "[The FBI's] actual cost for implementation of the FOIA in Fiscal year 1974 was $160,000. In Fiscal year 1975 it jumped to $462,000 and for the Fiscal year 1976 we have estimated the cost to be $2,675,000. For Fiscal year 1977, we have estimated the cost for the FOIA to be the same, $2,675,000, plus an additional $725,000 for the Privacy Act of 1974." [14]

If Congress' anticipation of the burden thrust upon all agencies by its 1974 FOIA amendments is to be taken as a measuring stick, then surely the demands placed on this one agency by Congress' action may reasonably be viewed as "exceptional circumstances."

B. *"Due Diligence"*

Whether the FBI has been exercising "due diligence" requires a short look at its present procedure for processing FOIA requests. Upon receipt of a request, the search begins with the FBI Central Records System of 58 million index cards of subjects and individuals. Examination of the index files often reveals other files in which re-

quested information may be located. Photographic working copies of entire file sections are made on which to mark deletions or exemptions as necessary. Personnel with experience in the area of the requested information then make a line by line reading of the files to determine which portions can be disclosed and which can be kept confidential under one of the nine exemptions to the Freedom of Information Act. The material is then subject to a higher review to see if matter which is legally exempt can still be disclosed without harm to, *inter alia*, confidential sources, privacy of individuals, classified data, etc. The series of reviews culminate in a decision over the FBI Director's signature.

To expedite this necessarily tedious process, requests are separated into difficult and simple requests, identified respectively as "project requests" or "non-project requests." Project requests customarily involve handling thousands of pages of documentary materials. Open America's request is so classified.

A project request is assigned to a project team, headed by a supervisory special agent, including five research analysts, and at least two research clerks. The particular team to which Open America's request has been assigned is in various stages of processing 33 other projects, all of which were received prior to Open America's request. One of the complications in this particular search is that the name of L. Patrick Gray was not indexed in connection with documents filed, since he was Acting Director of the Bureau and his name would have appeared on virtually every file during his tenure. So far over 38,000 pages have been located which the team supervisor believes should be carefully reviewed; 9,800 pages are directly relevant to the Watergate investigation and Mr. Gray's confirmation hearings. It is estimated that a little over half the job has been done and that review will be completed by around the first of

13. Leg.Hist. at 130.

14. Affidavit of John E. Howard, Special Agent, Federal Bureau of Investigation, at 4, Memo-

randum in Support of Government's Motion for a Stay Pending Appeal (Attachment B).

August 1976, with any appeal to be completed within three additional months.

One hundred ninety-one employees at FBI Headquarters alone are assigned solely to the processing of FOIA requests. At the time of Open America's request there was a total backlog of 5,137 requests, some project and some non-project. While the "two-track" system expedites simple requests and identifies those matters which will be more difficult and time-consuming, on each track the FBI attempts to proceed on a strictly first-in, first-out basis and to maintain approximately the same rate of progress. This, in itself, creates difficult personnel allocation problems, but things may be further complicated by the need to reapportion personnel to comply with court orders in cases of genuine need.[15]

Absent a court order, only three out of some 900 cases closed to date have been accorded "preferential handling" by being processed out of their normal chronological sequence. All three cases involved information needed in connection with pending litigation where time was of the essence.[16]

---

**15.** We know of two such cases presently being expedited under court orders. In a suit brought in the United States District Court for the District of Columbia by Michael Meeropol, son of Julius and Ethel Rosenberg, seeking documents related to his parents' trial and execution, Judge Green gave the Department of Justice less than three months to process plaintiff's request. *Meeropol v. Levi,* Civil Action No. 75–1121 (D.D.C., order issued 27 Aug. 1975). According to the Government, "In order to comply with the court's order 65 full-time and 21 part-time employees were assigned solely to this case. This number represented over one third of the personnel then assigned to the FOIA Section and required the diversion of some employees from non-project work to the Project Unit." Supplemental Memorandum for the Government Appellants at 5.

Also, in *Fellner v. Levi,* Civil Action No. 75–C–430 (W.D.Wis., order issued 17 Dec. 1975), a suit involving the request of an independent newspaper editor for materials relating to the actions of numerous individuals and dissident groups from 1966 to date, Judge Doyle of the Western District of Wisconsin ordered the FBI to review a minimum of 4,000 pages per month until plaintiff's request was processed. The Government informs us that "[i]n order to comply with the court's order the FBI has assigned three Research Analysts and three Research Assistants to work full-time on Mr. Fellner's request." Supplemental Memorandum for the Government Appellants at 5 (*footnote omitted*).

Judge Doyle's order also required the Bureau to process plaintiff's request in piecemeal fashion, *i. e.,* to depart from its normal procedure of processing and disclosing all relevant documents at one time. While it is difficult to determine whether the court-ordered method of piecemeal review is more or less efficient than the FBI's normal procedure, we can understand the administrative problems and inefficiencies created by a departure from standard routines. In a supplemental memorandum after oral argument, the Government described one administrative pitfall of piecemeal review already encountered by the FBI:

> [Although, t]he Fellner request lends itself more readily to piecemeal disclosure than would Open America's request because it involves 25 individuals, 9 organizations, and 6 events, which can to some extent be researched separately . . ., even here the FBI has found the piecemeal operation unsatisfactory because authorizations for the release of information pertaining to the 25 third parties have been received sporadically from Mr. Fellner. This has presented a special problem for the analyst because files which have been once reviewed and have had names deleted have had to be re-reviewed so that those names can be restored consistent with subsequently received authorizations. Similar problems would of course be encountered wherever policy changes in connection with claimed exemptions occurred in the course of reviewing a given file.

*Id.* at 5–6 n. 2.

**16.** In its supplemental memorandum the Government described the circumstances surrounding these three cases as follows:

> The first case involved a request for information by an accounting firm needed to defend itself in a civil suit brought by a contractor. The Department of Justice had previously investigated the contractor and his dealings with government contracting officials, and had initiated False Claims Act and criminal charges which were dropped without prosecution. The FOIA Unit was persuaded that the accounting firm's need for the documents was genuine, and the firm was willing to sharply curtail its request so as to limit it to a few documents which could be readily identified. On this basis expedition of the appeal was approved and the documents were released.

> The second case also involved imminent private litigation. The requester claimed that the opposing party to the suit had maliciously alleged to the FBI that he (the requester) had fraudulently concealed assets in the

### III. COURT AND AGENCY EXPEDITION PROCEDURE UNDER THE FREEDOM OF INFORMATION ACT

In determining for courts and agencies what should be the proper procedure for expediting information requests under the Freedom of Information Act, we must evaluate, in light of the objectives of the Act, the conflicting interests which will be affected by the procedure adopted.

The real parties at interest here may not be the Attorney General and the Director of the FBI at all, but the 5,137 other persons or organizations who made requests prior to plaintiff Open America. We have no doubt that the Government officials would comply promptly and faithfully with any order this court issued giving preferential, expedited treatment to the request of Open America. They would, of course, given their finite human and financial resources, do so by taking personnel away from other prior requests which the FBI is now engaged in processing.

We do not see, either on the face of the statute or on any sane analysis of the situation confronting the FBI and all other Government agencies in regard to Freedom of Information Act requests, why we should order such a reallocation of resources. Plaintiffs have alleged no urgency, have alleged no exceptional need, for the information they seek. Indeed, at oral argument counsel for plaintiffs was commendably frank in stating that the action of the District Court could not be defended on the ground of urgency or exceptional need, for the District Court made no such findings.

While neither we nor the District Court have undertaken examination of the fairness and efficiency of the FBI procedures, neither have we been asked to do so. There is no allegation by plaintiffs that the FBI procedure, treating each request on a first-in, first-out basis after initially separating the requests into the simple and the difficult tasks for appropriate processing, is anything but fair, orderly, and the most efficient procedure which can be adopted under the circumstances. There is no allegation that the FBI has failed to allocate an appropriate number of personnel for the processing of Freedom of Information Act requests, given its present budgetary limitations set by Congress.

Plaintiffs' argument, and the District Court's decision, rests completely on the theory that after a request is made, appealed, and denied, then on the face of the statute the applicant can go to court and secure, without further allegation or proof, an order placing him at the head of the line

course of obtaining a discharge in bankruptcy. Again the situation was such that if the Department's decision was to be of any assistance to the requester time was of the essence. Accordingly, the handling of the appeal was expedited. However, the appeal was adjudicated adversely to the requester on the merits.

The third case has been assigned for expedited processing but has not yet been finally reviewed. The appeal was filed by a member of Congress in the interest of his constituents.[4] The request relates to a document affecting title to thousands of acres of land involved in civil litigation in which the protagonists are farmers living on the land on the one hand and an Indian tribe claiming entitlement to it on the other. The Congressman advised the Department through his staff members that tempers in the community were getting short, and that he wished to assume an affirmative role in quieting the dispute in the interest of avoiding possible bloodshed. He believed that access to the document in question would assist him in his conciliatory efforts. Expedition of the administrative appeal was approved on the basis of these representations.

There have been numerous other requests for preferential handling. However, to the knowledge or recollection of the persons handling FOIA Appeals, these have been the only appeals processed on an expedited basis. Deputy Attorney General Tyler has thus almost invariably insisted upon strict adherence to the "first-in first-assigned" procedure for the processing of FOIA requests both initially and on appeal. . . .

[4] Requests and appeals filed by members of Congress seeking records pertaining to themselves are regarded as having been filed by private citizens and are not given expedited consideration.

Supplemental Memorandum for the Government Appellants at 9–10.

at the administrative agency. We conclude that this is not enough.

If this were enough, even those with the dimmest of eyesight could look ahead a few months and see that the regulation of priorities in *all* agencies, not just the FBI, would very shortly become the function of the courts. If everyone could go to court when his request had not been processed within thirty days, and by filing a court action automatically go to the head of the line at the agency, we would soon have a listing based on priority in filing lawsuits, *i. e.,* first into court, first out of the agency. This would be nothing but an inflation of a simple administrative request to a United States district court action, and like inflation in the monetary world would ultimately profit no one, since no one would be assigned a priority position any different than he would achieve if all applicants were left to the priorities fixed by the agency.

Of course, some would be content to have their curiosity satisfied in six to nine months, but surely others with a desire equal to the plaintiffs here would not have the financial resources to hire a lawyer and go to court, which would create a further invidious and unintended distinction.

We do not think that Congress intended, by fixing a time limitation on agency action and according a right to bring suit when the applicant has not been satisfied within the time limits, to grant an automatic preference by the mere action of filing a case in United States district court. Because the pernicious results of such an interpretation are so blatantly obvious—certainly under the "exceptional circumstances" which have materialized since passage of the 1974 amendments—we refuse to attribute such dim vision to the Congress.

■■■ We believe that Congress intended for a district court to require an agency to give priority to a request for information if some exceptional need or urgency attached to the request justified putting it ahead of all other requests received by the same agency prior thereto. This is, of course, on the assumption that the agency can be shown to be exercising due diligence. In this case we believe such a showing of due diligence has been made by the affidavits, and, indeed, no lack of *overall* diligence in handling the thousands of requests has been alleged by plaintiffs.

Further, the interests of those who have a real need and urgency for the information, and who have been previously able to go to court and get their requests satisfied after making a showing of their need and urgency, would be frustrated and vitiated by the interpretation urged by plaintiffs here. If *any* request for information can be the subject of a court order to the agency to place the request in a priority position, without any showing in court of urgency or exceptional need, then these court-ordered cases will take their places along with those court-ordered cases in which genuine urgency and need have been shown. The result will be that not only similar, prior, non-urgent requests will be displaced; even those requests with an urgent need will be unable to get to the head of the line, because of the crowd of miscellaneous requests already placed there by court order without any showing of urgency or need whatsoever.

■■■ We believe that Congress intended to guarantee access to Government agency documents on an equal and fair basis. Good faith and due diligence call for a procedure which is fair overall in the particular agency. We believe also that Congress wished to reserve the role of the courts for two occasions, (1) when the agency was not showing due diligence in processing plaintiff's individual request or was lax overall in meeting its obligations under the Act with all available resources,[17] and (2) when

---

17. The fulfillment of the objectives of the Freedom of Information Act is a matter in which Congress has shown keen interest and exercised continuous oversight. If the speed of replying to requests in any agency is not satisfactory to Congress, and the obvious cause is a lack of available resources considering the agency's other primary functions, the equally obvious remedy is for Congress to supply the necessary resources and to designate their use for FOIA purposes. We express no opinion as

plaintiff can show a genuine need and reason for urgency in gaining access to Government records ahead of prior applicants for information. The role of the courts in achieving both of these objectives would be totally jeopardized by the interpretation of the statute urged by plaintiffs here.

■■■ In summary, we interpret Section 552(a)(6)(C) to mean that "exceptional circumstances exist" when an agency, like the FBI here, is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests. In such situation, in the language of subsection (6)(C), "the court may retain jurisdiction and allow the agency additional time to complete its review of the records." Under the circumstances defined above the time limits prescribed by Congress in subsection (6)(A) become not mandatory but directory. The good faith effort and due diligence of the agency to comply with all lawful demands under the Freedom of Information Act in as short a time as is possible by assigning all requests on a first-in, first-out

to whether the initiative here should come from the agency or Congress.

1. *See, e. g.,* letter from Deputy Atty. Gen. Harold Tyler to the Hon. Bella Abzug, Chairwoman, Government Information & Individual Rights Subcommittee, Committee on Government Operations, Mar. 15, 1976:

> One of the provisions in the amendments to the Act that certainly has not worked out as anyone intended is the imposition of very short time limits for the processing of requests. I fully understand and accept the desire of Congress to demonstrate the importance it attached to the reasonably expeditious processing of requests for access to records. In my opinion, however, any time limit that does not take into consideration the number and complexity of the records within the scope of the individual request is both unrealistic and wholly unworkable.
>
> \* \* \* \* \* \*
>
> There is one additional serious problem I desire to bring to your specific attention.

basis, except those where exceptional need or urgency is shown, is compliance with the Act. The order of the District Court is therefore vacated and the case remanded for such action under the statute as is consistent with this opinion.

So ordered.

LEVENTHAL, Circuit Judge (concurring in the result).

At stake in this case is the right of applicants—here, Open America—to have the Department of Justice process information requests in accordance with Freedom of Information Act (FOIA) requirements, and the definition and enforcement of that right. The Justice Department has protested to Congress about the difficulty of meeting the FOIA's new time limits on administrative processing of requests under the Act;[1] failing to get a remedy from Congress, the Department has apparently chosen this case to seek broad court relief. The majority has obliged—and going beyond the holding which I agree requires this case to be remanded to the district court for further proceedings, delivers dictum accepting the broad premise for relief asserted by the Department of Justice, dictum in which I do not join.

> That is the situation created by those cases in which we are sued before the administrative review process has been completed. Although the number of such cases is not particularly great, this unfortunate provision in the Act usually results in the individual who has sued receiving preferential consideration over the far greater number of other [usually prior] requesters and appellants who choose not to file suit, or who cannot do so.
>
> \* \* \* \* \* \*
>
> Absent some *wholly arbitrary* refusal to expedite a particular request or appeal when exceptional circumstances exist, each individual should be required to wait his or her turn in line. The law as presently written places the burden on the Government to prove that a case should *not* receive preferential, expedited treatment. This imbalance should be corrected, in fairness to other requesters and to eliminate an unnecessary contribution to the congestion of court dockets in the Federal Judicial System.

## I.

The majority's inclination to speak broadly may be partly explained by the fact that the district court's order declining to grant relief from the Act's strict time provisions[2] is without explication, providing opportunity to speculate. Whatever the cause, the majority's discussion today ranges more broadly than is necessary to decide the issue in this appeal. The issue is whether the district court abused its discretion in failing to "retain jurisdiction and allow the agency additional time to complete its review of the records" if in accordance with § 552(a)(6)(C), "the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." The Government made an uncontroverted showing by affidavit that FOIA requests have increased at a rate entirely unforeseen and unforeseeable,[3] and that the consequent lag in obtaining and training personnel to deal with these requests has led to a substantial backlog; and that this has made strict compliance with the FOIA time limits impossible. It seems to me that this showing may well constitute the "exceptional circumstances" that combined with a demonstration of due diligence, would warrant allowing the agency additional time under § 552(a)(6)(C).

We need not go any further. The safety valve provisions of § 552(a)(6)(C) were carefully crafted to put a substantial burden on the government to justify to the courts any noncompliance with FOIA time limits. What the majority dictum would contemplate, however, is a scheme that turns the burden of proof mandated by Congress upside down. No longer must the Government make out a case of exceptional circumstances; instead the *plaintiff* will be required to show a "genuine need and reason for urgency." Maj. Op., 178 U.S. App.D.C. at ——, 547 F.2d at 616. This seems to me a clear departure from the very premise of the section we are engaged in interpreting. It is not supported by statutory language, and indeed seems in conflict with the entire remedial thrust of the 1974 amendments to FOIA.

It must be remembered that the 1974 Amendments were deliberately drafted to force increased expedition in the handling of FOIA requests: "[E]xcessive delay by the agency in its response is often tantamount to denial. It is the intent of this bill that the affected agencies be required to respond to inquiries and administrative appeals within specific time limits." H.Rep. No.93–876, 93d Cong., 2d Sess. (1974), U.S. Code Cong. & Ad.News, p. 6271. Those time limits took into account the objections of such agencies as the Justice Department, by providing that a ten-working-day extension could be allowed for "unusual circumstances," such as where the requested records come from separate field facilities, where the agency must "search for, collect and examine a voluminous amount of separate and distinct records demanded in a single request," or where consultation with another agency is necessary. S.Conf.Rep. No.93–1200, U.S.C.A.A.N. at 6289. *See* 5 U.S.C. § 552(a)(6)(B). It is this 10-day provision, specifically anticipating the problem posed by the "voluminous material" request, which was intended to govern in the usual case. The Congress even rejected a 30-day extension provision, narrowly drafted to take account of the special exigencies facing such agencies as the Immigration

---

**2.** The reasoning employed by the court cannot be directly inferred from its order. The district court may have decided, for example, that the short-run bulge of requests plaguing the agency did not constitute exceptional circumstances; or that due diligence had not been demonstrated; or that even if exceptional circumstances and due diligence were made out it did not find the case an appropriate one to grant relief from the normal timing requirements.

The majority speculates instead that the district court's order rested on its finding that plaintiffs had an absolute right to have their request processed within the statutory ten-day and twenty-day periods established under 5 U.S.C. § 552(a)(6)(A).

**3.** The Department of Justice Appeal's division had handled 100 appeals in the 12 month period prior to the date the FOIA Amendments became effective; in the next 12 months they received 1276. The FBI in calendar year 1974 had received 447 FOIA requests; in 1975, 13,875 requests were received.

and Naturalization Service (INS)—which processes an average of 90,000 formal requests for records each year, seeking access to one or more of the twelve million individual files scattered among and frequently transferred between 57 field offices and 10 Federal Records Centers. Even that provision was not intended to have been available to agencies, like D.O.J. in this case, "that simply processed large volumes of requests or frequently faced novel questions of legal interpretation . . . nor could agencies or parts of agencies utilize [the provision] simply because they had been unable to regularly meet standard deadlines, without a showing of the geographical and other concrete obstacles to the location of files or records present in the INS example." S.Rep.No.93–854, 93d Cong. 2d Sess. (1974), p. 26. It would be anomalous to interpret the "exceptional circumstances" provision relied on by the majority to permit open-ended approval of agency failure to meet the Act's specific time limits, when a much more rigorous standard for granting a limited 30-day extension was rejected as too lax. See Hayden v. U. S. Dept. of Justice, et al., No. 76–0288, 413 F.Supp. 1285 (D.D.C., 1976). The majority's reasoning by implication from the language of the "exceptional circumstances" provision alone can only be sustained if the specific drafting history of the Act we are interpreting is entirely ignored.

It does seems clear to me that absent a special allegation of urgency in processing, the safety valve provided by the exceptional circumstances provision may be available to give relief to the D.O.J. in this case.[4] The unexpected surge in requests combined with the lack of trained personnel qualified to deal with them may meet the government's burden of showing "exceptional circumstances" in the short term. An effective demonstration of due diligence might in turn depend on whether the agency has applied for additional funds to meet the unexpected upsurge in requests, whether it

has been or is now willing to allow partial release of documents rather than conditioning release on complete processing of the request, and whether it has or will defer considering any voluntary actions of disclosure which are plainly outside the scope of FOIA, in the interest of expediting disclosure of material expressly covered by the Act.

It should be noted that even a Justice Department failure to make out a case for an "exceptional circumstances" exception, as contemplated by Congress, will not necessarily subject the Department to contempt to coerce compliance. As we recognized in NRDC v. Train, 166 U.S.App.D.C. 312, 333, 510 F.2d 692, 713 (1974), "it would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply." But our ability as an equity court to withhold the contempt sanction when compliance is impossible, should not affect our duty to construe the underlying statute to accord with Congressional intent. The legislature contemplates that the judiciary will seek to define executive compliance according to the legislative mandate. Softening that mandate by construction serves to provide a gloss that the agency is properly performing the duties assigned by the statute, and operates, in effect, to gloss over and screen out any shortfalls in agency performance from the committees and bodies of the legislature. They might otherwise be compelled—by explicit judicial avowal that its decree enforcing the legislative will cannot be enforced by sanctions—to confront the gulf between their expressed will and the practical realities of agency compliance. Adapting what we have said in earlier cases—"So long as [Congress] prescribes a system of [performance] by an agency subject to court review the courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of [nonperformance] in agency trappings." Public Service Com'n,

---

4. See, e. g., Cleaver v. Kelley, No. 795–76, 415 F.Supp. 174 (D.D.C.1976), where the court found that the unusual upsurge in requests did constitute exceptional circumstances, and that

the agency had been exercising due diligence. The court did not consider whether the urgency alleged by petitioners should be considered in making that determination.

*State of N. Y. v. FPC*, 167 U.S.App.D.C. 100, 116, 511 F.2d 338, 354 (1975).[5]

## II.

If the Government has here met its burden for relief from the F.O.I.A.'s specific time provisions because of a short-term inability to cope with a huge jump in information requests, there is no need to seek to forecast the reasonableness of defendants' administrative approach once adjustments to deal with the increased volume of FOIA requests are fully implemented. However, the majority assumes that the Department's troubles in meeting FOIA's time limits will continue, and the opinion seeks to justify those failures in advance. Those justifications I find to be dubious and problemful.

The Justice Department's first-in first-out approach for handling FOIA applications, which it has adopted as a general rule subject to exceptions,[6] seems sensible on its face and sound as an administrative method for allocating priority among FOIA requests received by the agency.[7] It is not contested as such, as I understand the position of applicant Open America. However, the processing sequence thus established for the administrative agency or executive respondent processing a request is not impervious to the fact that the filing of a court action is itself a priority-indicating factor of significance. The Act not only authorizes a court action to be filed after notably short periods of administrative consideration, but specifically directs that after the complaint is filed the Government shall file its answer within thirty days, instead of the 60 days normally provided to the Government, and that thereafter the case shall "take precedence" and be "expedited in every way."[8]

---

5. *Texas Gulf Coast Area Rate Cases*, 159 U.S. App.D.C. 172, 208–09, 487 F.2d 1043, 1079–80 (1973), vacated and remanded sub nom. *Shell Oil Co. v. Public Service Comm's*, 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974), where Judge Wilkey noted: The reviewing court's duty is to "assure fidelity to the functions assigned to the regulatory agency by Congress."

6. Defendants' approach admittedly is not strictly first-in first-out. The division of requests into the categories of "project requests" and "non-project requests," *see* Majority Op. at 612–613, serves the interest in expediting simple requests but means, at the same time, that even though each track is handled on a first-in first-out basis some requests from one category will likely be completed before earlier filed requests from the other category are processed. Similarly, adjustments in the system necessitated by "court orders in cases of genuine need" and agency determinations of cases requiring "preferential handling," *see* Majority Op. at 613, accommodate the interest in timely resolution of pressing matters, but obviously run counter to the first-in first-out approach. Also the Government has to some extent deliberately deferred requests that have entitlement under the Act in order to process other requests. This comes about because of the Government's policy of reviewing all requests for the purpose of exercising its discretionary power to release technically exempt material. The interest in "the maximum possible, responsible disclosure of records" can hardly be faulted and the approach used makes good sense administratively, but this policy of course "is an important factor contributing to the backlog within the Appeals Unit." Letter from Harold R. Tyler, Jr., Deputy Attorney General, to Honorable Bella S. Abzug, Chairwoman, Government Information and Individual Rights Subcommittee, Committee on Government Operations, March 15, 1976, at 2–3, Supplemental Memorandum for the Government Appellants (Attachment B).

Each of these modifications, of course, may be reasonable as a matter of administrative procedure. *See* footnote 7 *infra*.

7. The approach in the main is simple, understandable and workable and, in addition, appears to serve the interest in fair treatment. Even the agency-imposed exceptions to a strictly first-in first-out procedure—such as the two track classification or the exception for cases requiring "preferential handling," *see* footnote 6 *supra*—would appear to have a sound basis.

8. 5 U.S.C. § 552(a)(4)(C) sets 30 days for answer (unless the court otherwise directs for good cause shown) in contrast with the 60 days generally available automatically under Rule 12(a), Fed.Rules Civ.Proc.

The precedence and expediting provision appears in 5 U.S.C. § 552(a)(4)(D): "Except as to cases the court considers of greater importance, proceedings before the district court, as authorized by this subsection, and appeals therefrom, take precedence on the docket over all cases and shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way."

Congress thus made the filing of the action an event that triggers expedition of determination in the court—apart from any expedition in the administrative process. Diligence in seeking court relief is not a fool proof way of assigning priority, but it is material and by no means unprecedented. For instance, a debtor normally should pay off debts in the order they accrue. But if a debt is not paid when due, the creditor who goes to court will receive priority over a creditor who waits, for whatever reason. In granting the litigating creditor a priority the court does not inquire as to his motivation or assess his need.

The assumptions which underlie this "race of diligence" concept are not without meaning for applicants under FOIA. There are common and sensible reasons for choosing not to sue despite the priority awarded to litigants, as in the case of creditors who may be willing to await delayed payment or even risk nonpayment in hopes of future business. Similarly, FOIA applicants may reasonably believe that by cooperating with the agency they may enhance the possibility of obtaining more complete information from the agency, for instance through a favorable exercise of the agency's discretion to release certain technically exempt material. The merely curious may well be motivated enough to write a letter, but not to file a law suit.[9]

This marks no discrimination on ground of wealth, as the majority assert, for Congress has provided litigation costs and attorney's fees.[10] In this setting, we cannot say that diligent litigation is without significance as a rough indicator of priority. A priority continually unfolding on that basis is reasonable enough and does not conflict with the FOIA provision that an applicant is not required to show "need" to be entitled to relief.

### III.

A disquieting feature in the majority opinion is its willingness to inquire about defendants' resources as a predicate for determining the rights of the parties.

In general, the courts are established to declare rights, and they should not take into account the resources of the defendant as a reason for not declaring a right. Otherwise, the courts will have to go beyond examining the relationship of the parties, generally a sufficiently difficult task, and go into the relationship of the defendant to all other persons having a claim upon him, an essentially unmanageable task. In certain structured instances the courts have been asked or even compelled, to adjudge competing and conflicting claims upon a single defendant.[11] And there certainly is some room for a court in equity to stay its hand, and to forbear from enforcing a declared right in cases where the defendant is called upon to do the impossible.[12] But absent a clear statutory mandate or extraordinary circumstances a court does not normally inquire into a defendant's re-

---

9. There is at least some reason to believe that at this early stage of FOIA operations the merely curious may predominate among all applicants. *See also* footnote 10 *infra*.

10. The majority apparently concedes that granting litigants priority rationally serves the legitimate purpose of separating those applicants with a significant concern from the merely curious who "would be content to have their curiosity satisfied in six to nine months." Majority Op. at 615. It argues, however, that giving litigants priority would create an "invidious and unintended distinction" based on wealth. *Id.* Congress, however, considered the important role of the courts in enforcement of FOIA and provided for the award of "attorney

fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E).

11. Interpleader under Rule 22, F.R.Civ.P., and proceedings in bankruptcy are instances in which courts may be obliged to examine all claims of a particular kind presently assertable against a single defendant.

12. *See, e. g. Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); *Natural Resources Defense Council, Inc. v. Train,* 166 U.S. App.D.C. 312, 333, 510 F.2d 692, 713 (1975).

sources in order to determine whether to declare a right claimed by plaintiff.[13]

If a court is to go beyond the relationship of the parties toward acceptance of an unqualified defense of presently inadequate resources, how is it to determine that the defendant has done all that can reasonably be expected of it in acquiring adequate resources or in efficiently managing the resources it has? And in the case of government agencies, should the court fully examine the agency's management in order to decide if a defense is available? I do not think courts should make such an inquiry beyond the limited function opened up by Congress—of deciding a government's prayer based on exceptional circumstances and due diligence, as contrasted with its steady burdens.

A court considering a prayer for relief against an agency normally acts in relation to the case before it without inquiring into the impact of its order on other activities of the agency. Everytime a court remands for further proceedings within a specified time it may be requiring an agency to shift its normal allocation of business in order to comply.

The majority's opinion appears to go well beyond the peculiar circumstances of the instant case. It seems to conclude rather broadly that whatever the cause of the volume of requests confronting it, an agency complies with the Act so long as it processes those requests in "good faith" and with "due diligence" by "assigning all requests on a first in, first out basis, except those where exceptional need or urgency is shown," no matter what delay is caused thereby.[14] If so then one may wonder, along with plaintiffs, whether such a broad defense will become in effect a self-fulfilling prophecy in derogation of Congressional intent for expedition. At a time when all agencies have abundant work apart from FOIA, it is reasonable to ask what impetus will remain for agencies to adjust to the explicit time limits imposed by Congress if the Act is interpreted to grant them leeway so long as requests are processed in the order of their arrival.

I would at this point simply vacate the order of the District Court and remand the case for a determination whether defendants are entitled to any relief under 5 U.S.C. § 552(a)(6)(C) in light of the probable existence of "exceptional circumstances." I concur in the order of remand and in that much of the majority opinion. The rest of the majority opinion is overly broad in its interpretation of § 552(a)(6)(C); as currently premised is inconsistent with the mandate of Congress; and in any event is premature.

---

**13.** Quite different considerations are involved when a court stays its hand to require exhaustion of administrative remedies. That is a judicial doctrine, it is subject to an exception for delay, and in FOIA it has been overridden by a Congress solicitous lest it be the plaintiff who is exhausted rather than his remedies.

**14.** Majority Op., 178 U.S.App.D.C. at ——, 547 F.2d at 616.