Harold WEISBERG

v.

U.S. DEPARTMENT OF JUSTICE,
Appellant. (Two cases).

Harold WEISBERG, Appellant,

v.

U.S. DEPARTMENT OF JUSTICE.
(Two cases).

Nos. 82–1229, 82–1274, 83–1722
and 83–1764.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 1984.

Decided Oct. 5, 1984.

James H. Lesar, Washington, D.C., for Weisberg, appellant in Nos. 82–1274 and 83–1764 and cross appellee in Nos. 82–1229 and 83–1722.

John S. Koppel, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for U.S. Dept. of Justice, appellee in Nos. 82–1274 and 83–1764 and cross appellant in Nos. 82–1229 and 83–1722.

John M. Rogers and Marilyn S.G. Urwitz, Attys., Dept. of Justice, Washington, D.C., also entered appearances for U.S. Dept. of Justice.

Before MIKVA, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This Freedom of Information Act suit concerns a nine-year quest for information from the Department of Justice ("the Department" or "DOJ") and its various components with respect to the investigation of the assassination of Dr. Martin Luther King, Jr. In these cross-appeals, the parties challenge various orders of the District Court. Appellant and cross-appellee Harold Weisberg[1] challenges the District Court's rulings that the Department performed an adequate and good-faith search of its records; that the FOIA exemptions claimed by the Department were properly invoked; and that the Department did not owe a consultancy fee to Mr. Weisberg. The Department of Justice as appellee and cross-appellant primarily challenges the District Court's award of attorneys' fees to appellant, arguing that Mr. Weisberg did not substantially prevail in this litigation; that even if eligible for such an award he is not entitled to an award of attorneys' fees; and that even if Mr. Weisberg was both eligible for and entitled to an attorneys' fees award, the award was excessive. Appellant Weisberg, on cross-appeal, contends that the District Court's calculation of attorneys' fees was erroneous because it excluded certain amounts of time; improperly determined the hourly rate; and refused to adjust the award to take account of the delay in receiving the fees.

---

1. Harold Weisberg is the author of numerous books on the assassinations of President Kennedy and Dr. King. Second Affidavit of Harold Weisberg, Joint Appendix ("JA") 190–91. In addition, Mr. Weisberg was the investigator for James Earl Ray, who pled guilty to the assassi-

nation of Dr. King. Letter from James H. Lesar, Esq. to Harold R. Tyler, Jr., Nov. 4, 1976, JA 249–51. Mr. Lesar, Mr. Weisberg's attorney, represented James Earl Ray in various proceedings challenging his guilty plea. *Id.*

We affirm the District Court's award of summary judgment in favor of the Department as to the adequacy of its search, the propriety of the claimed exemptions and the absence of a consultancy agreement. We vacate the District Court's order awarding attorneys' fees and remand for reconsideration of whether appellant substantially prevailed in this litigation. Should the District Court conclude that he did substantially prevail, we direct the court on remand to reconsider whether appellant is entitled to an award of attorneys' fees. If the District Court concludes that Mr. Weisberg is so entitled, we further direct the court to consider exclusion of any non-productive time devoted to this litigation and to consider whether the Supreme Court's intervening decision in *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), permits an upward adjustment of the lodestar award in the circumstances of this case.

**2.** Mr. Weisberg had sought some information on the King assassination from the FBI in an earlier request dated March 10, 1969. JA 238. This request, however, did not identify the Freedom of Information Act as its basis. Nor did Mr. Weisberg include the FBI's alleged refusal to answer this request as a basis for his subsequently filed suit. Complaint, JA 28–29, 36. Thus, although Mr. Weisberg has made frequent mention of this "request" throughout this litigation, only his two FOIA requests submitted in 1975 are the subject of this lawsuit. At the time of Mr. Weisberg's first request, however, it is unlikely that the information sought would have been subject to release because the Act's exemption for investigatory files compiled for law enforcement purposes would probably have prevented disclosure. In *Weisberg v. Department of Justice*, 489 F.2d 1195 (D.C.Cir.1973) (en banc), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974), a suit in which Mr. Weisberg sought information concerning the assassination of President John F. Kennedy, this court upheld that broad construction of the law enforcement investigatory files exemption. In 1974, Congress amended the FOIA and narrowed the scope of that exemption. Act of Nov. 21, 1974, Pub.L. No. 93–502, § 2, 88 Stat. 1561, 1563–64 (codified at 5 U.S.C. § 552(b)(7) (1982)).

**3.** The complete text of Mr. Weisberg's first FOIA request reads as follows:
 1. The results of any ballistics tests.
 2. The results of any spectrographic or neutron activation analyses.

### I

Before embarking on a discussion of the issues presented by these appeals, we first chronicle the most significant events in the lengthy history of this litigation.

### A

On April 15, 1975, Harold Weisberg filed an administrative request with the Attorney General under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 (1982), for information concerning the assassination of Dr. Martin Luther King, Jr.[2] The request sought disclosure of certain categories of information concerning evidence developed by the FBI during its investigation of the assassination.[3] It requested the results of ballistics tests, neutron activation and spectrographic analyses,[4] scientific tests conducted on certain physical evidence, photographs and

3. The results of any scientific tests made on the dent in the windowsill of the bathroom window from which Dr. King was allegedly shot.
4. The results of any scientific tests performed on the butts, ashes or other cigarette remains found in the white Mustang abandoned in Atlanta after Dr. King's assassination and all reports made in regard to said cigarette remains.
5. All photographs or sketches of any suspects in the assassination of Dr. King.
6. All photographs from whatever source taken at the scene of the crime on April 4th or April 5th, 1969.
7. All information, documents, or reports made available to any author or writer, including but not limited to Clay Blair, Jeremiah O'Leary, George MacMillan, Gerold Frank, and William Bradford Huie.

**4.** In *Weisberg v. Department of Justice*, 705 F.2d 1344 (D.C.Cir.1983), another of Mr. Weisberg's suits under the FOIA, this court explained that
 spectrographic and neutron activation analyses are designed to determine the composition of small samples of materials. In spectrographic analysis, samples are sparked or burned to produce a spectrum of light that is exposed to a photographic plate; the plate may be analyzed to measure elements present in the sample. In neutron activation analysis, samples are bombarded in a nuclear reactor; the energy samples they emit may be measured for the same purpose.
*Id.* at 1347 n. 1. In *Weisberg v. Department of Justice*, Mr. Weisberg filed suit on an FOIA

sketches of any suspects, photographs of the crime scene, and any information provided to other authors. The FBI wrote Mr. Weisberg acknowledging the request, but advised him that the large volume of requests reviewed in the wake of the FOIA amendments of 1974 would necessitate a delay in processing the request. Joint Appendix ("JA") 32, 34, 35. *See Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 610 (D.C.Cir.1976) (describing "virtual deluge of requests since the effective date of the FOIA amendments"). Mr. Weisberg brought suit seeking compliance with this first request on November 23, 1975. JA 28–35.

One month after filing suit, on December 23, 1975, Mr. Weisberg filed another administrative request under the Act. Far more expansive than his April 1975 request, this second request specified twenty-eight different categories of information concerning Dr. King's assassination. The categories of information included, to list only a few, all letters, documents, reports, memoranda, and physical evidence with respect to the investigation of the King assassination, reports concerning fingerprints, and communications relating to the investigation between state prosecutors and DOJ officials. JA 37–41.[5] One day later, before expiration of the ten-day statutory response peri-

---

request for information concerning the assassination of President Kennedy that he had submitted on the first day after the Act's amendments went into effect.

**5.** The complete text of Mr. Weisberg's second request reads as follows:

1. All receipts for any letters, cables, documents, reports, memorandums [*sic*], or other communications in any form whatsoever.

2. All receipts for any items of physical evidence.

3. All reports or memorandums on the results of any tests performed on any item of evidence, including any comparisons normally made in the investigation of a crime.

4. All reports or memorandums on any fingerprints found at the scene of the crime or on any item allegedly related to the crime. This is meant to include, for example, any fingerprints found in or on the white Mustang abandoned in Atlanta, in any room allegedly used or rented by James Earl Ray, and on any registration card. It should also include all fingerprints found on any item considered as evidence in the assassination of Dr. Martin Luther King, Jr.

5. Any taxicab log or manifest of Memphis cab driver James McCraw or the cab company for which he worked.

6. Any tape or transcript of the radio logs of the Memphis Police Department or the Shelby County Sheriff's Office for April 4, 1968.

7. All correspondence and records of other communications exchanged between the Department of Justice or any division thereof and: [listing names].

8. All correspondence or records of other communications pertaining to the guilty plea of James Earl Ray exchanged between the Department of Justice or any division thereof and: [listing names].

9. All notes or memorandums pertaining to any letter, cable, or other written communication from or on behalf of the District Attorney General of Shelby County, Tennessee, or the

Attorney General of Tennessee to the Department of Justice or any division thereof.

10. All notes or memorandums pertaining to any telephonic or verbal communications from or on behalf of the District Attorney General of Shelby County, Tennessee, or the Attorney General of Tennessee to the Department of Justice or any division thereof.

11. All tape recordings and all logs, transcripts, notes, reports, memorandums or any other written record of or reflecting any surveillance of any kind whatsoever of the following persons: [listing names].

This is meant to include not only physical shadowing but also mail covers, mail interception, interception by any telephonic, electronic mechanical or other means, as well as conversations with third persons and the use of informants.

12. All tape recordings and all logs, transcripts, notes, reports, memorandums or any other written record of or reflecting any surveillance of any kind whatsoever on the Committee to Investigate Assassinations (CTIA) or any person associated with it in any way.

This is meant to include not only physical shadowing but also mail covers, mail interception, interception by any telephonic, electronic, mechanical or other means, as well as conversations with third persons and the use of informants.

13. All records pertaining to any alleged or contemplated witness, including any statements, transcripts, reports, or memorandums from any source whatsoever.

14. All correspondence of the following persons, regardless of origin or however obtained: [listing names].

15. All letters, cables, reports, memorandums or any other form of communication concerning the proposed guilty plea of James Earl Ray.

16. All records of any information request or inquiry from or any contact by, any member or representative of the news media pertain-

od, 5 U.S.C. § 552(a)(6)(A)(i), Mr. Weisberg amended his previously filed complaint pursuant to Fed.R.Civ.P. 15(a) to include the second administrative request. JA 36.

The Department filed an answer, contending that the first complaint, based on the April 1975 request, was moot because DOJ had already disclosed information responsive to that request. JA 42–43. The Department further contended that the amended complaint was premature inasfar as it was based on the unexhausted requests for information in appellant's second request. *Id.* Despite these contentions, the District Court permitted the liti-

gation to continue. Transcript of Hearing, May 5, 1976, JA 107. Between April and August 1976, appellant was provided with information responsive to his first request from the files of the Department's Civil Rights Division.[6]

At this early stage of the litigation, the issues focused primarily on the first FOIA request (in April 1975) and on Mr. Weisberg's desire to have copies of certain photographs copyrighted by TIME, Inc., but located in the FBI files. The Department, however, refused by virtue of TIME's copyright[7] to copy the photographs for release

---

ing to the assassination of Dr. Martin Luther King, Jr. since April 15, 1975.

17. All notes, memoranda, correspondence or investigative reports constituting or pertaining to any re-investigation or attempts at re-investigation of the assassination of Dr. King undertaken in 1969 or anytime thereafter, and all documents setting forth the reason or guidelines for any such re-investigation.

18. Any and all records pertaining to the New Rebel Motel and the DeSoto Motel.

19. Any records pertaining to James Earl Ray's eyesight.

20. Any records made available to any writer or news reporter which have not been made available to Mr. Harold Weisberg.

21. Any index or table of contents to the 96 volumes of evidence on the assassination of Dr. King.

22. A list of all evidence conveyed to or from the FBI by legal authority, whether state, local, or federal.

23. All reports, notes, correspondence, or memorandums pertaining to any efforts by the Department of Justice to expedite the transcript of the evidentiary hearing held in October, 1974, on James Earl Ray's petition for a writ of habeas corpus.

24. All reports, notes or memorandums on information contained in any tape recording delivered or made available to the FBI or the District Attorney General of Shelby County by anyone whomsoever. All correspondence engaged in with respect to any investigation which was made of the information contained in any of the foregoing.

25. All records of any contact, direct or indirect, by the FBI, any other police or law enforcement officials, or their informants, with the Memphis group of young black radicals known as The Invaders.

26. All records of any surveillance of any kind of The Invaders or any member or associate of that organization. This is meant to include not only physical shadowing but also mail covers, mail interception, interception by telephonic, electronic, mechanical· or other

means, as well as conversations with third persons and the use of informants.

27. All records of any surveillance of any kind of any of the unions involved in or associated with the garbage strike in Memphis or any employees or officials of said unions. This is meant to include not only physical shadowing but also mail covers, mail interception, interception by any telephonic, electronic, mechanical or other means, as well as conversations with third persons and the use of informants.

28. All records containing information which exculpates or tends to exculpate James Earl Ray of the crime which he allegedly committed.

This request for disclosure is made under the Freedom of Information Act, 5 U.S.C. § 552, as amended by Public Law 93–502, 88 Stat. 1561.

6. Other responsive documents located in those files which had been initially provided to the Division by another DOJ component were referred for processing to other divisions of the Department. Affidavit of Mark L. Gross, Record ("R") 25.

7. The Department contended that the copyrighted photographs were not agency records within the meaning of the Act, and that they were exempted from disclosure pursuant to exemption 3, 5 U.S.C. § 552(b)(3), under the Copyright Act, 17 U.S.C. §§ 101–810 (1976), and exemption 4. The District Court, however, ruled that the photographs were agency records and that neither exemption 3 or 4 precluded disclosure. R. 57. This court, on appeal, affirmed the District Court's conclusion that the photographs were agency records, but declined to reach the issue whether the copyright laws precluded disclosure under exemptions 3 and 4 because it concluded that TIME, Inc. should have been joined as a party in the action pursuant to FED.R.CIV.P. 19(a). *Weisberg v. Department of Justice,* 631

to Mr. Weisberg, although the Department did provide access to them.

Thereafter, the litigation focused primarily upon the adequacy of the Department's searches of its files for information responsive to Mr. Weisberg's two requests. The Department completed the processing of much of the first request by October 1976, see R. 25, but by that time had only begun processing appellant's second request. Transcript of Hearing, Oct. 8, 1976, JA 244–45. The Department construed Mr. Weisberg's second request broadly, interpreting it to include not only the specific items requested, but also the entirety of the FBI's headquarters files concerning the investigation of the King assassination, the so-called "Murkin" files (an FBI abbreviation for the King murder case). See, e.g., R. 32; Transcript of Hearing, Oct. 8, 1976, JA 243–45. The FBI interpreted the request in this manner primarily because of the voluminous quantity of the FBI's Murkin files and the correspondingly large size of the request, the historical significance of the King assassination investigation, and the public's interest in the FBI's investigation. During late 1976 and through 1977, the FBI processed the great bulk of these files, which resulted in the disclosure of approximately 45,000 pages of documents.

Not content with the extent of DOJ's disclosures, however, Mr. Weisberg continued to maintain that the FBI had failed to conduct an adequate search. In particular, appellant wanted the FBI to search the files of certain FBI field offices, in addition to the files at FBI headquarters. In an attempt to resolve amicably the disagreements pertaining to the scope of the search, the Department and appellant entered into a stipulation on August 11, 1977, defining the Department's search obligations. JA 268. Approved by the District Court, the stipulation provided a timetable for completion of the Department's processing of Mr. Weisberg's two requests.[8] It specified, among other things, that the FBI would provide copies of the contents of some of the FBI's field office files; that duplicates of the headquarters' Murkin files which had already been provided would not be reprocessed; but that attachments not provided to appellant would be processed and provided; and finally, that duplicates with notations would be provided. The stipulation further provided that documents pertaining to the Sanitation Workers Strike in Memphis and "the Invaders," see supra note 5, items 25–26, would be provided.[9] Appellant agreed in the stip-

---

F.2d 824, 828–29 (D.C.Cir.1980). On remand, the parties resolved the dispute without further litigation and TIME, Inc. permitted Mr. Weisberg to copy its photographs. Transcript of Hearing, Aug. 15, 1980, 3–4.

**8.** The FBI had already begun processing the Murkin file in response to Mr. Weisberg's December 23, 1975 request in October 1976, almost a year before the stipulation. Between October 1976 and February 1977, the FBI had made available some 7,200 pages. Affidavit of Horace P. Beckwith, R. 39. By June 30, 1977, appellant had been given approximately 20,000 pages of documents. Transcript of Hearing, June 30, 1977, at 2. By September 9, 1977, appellant had received approximately 23,000 pages of documents. Transcript of Hearing, Sept. 15, 1977, at 2. By November 1977, Mr. Weisberg had received approximately 45,000 pages of documents, consisting primarily of the Murkin files. Transcript of Hearing, Nov. 2, 1977 at 2.

In addition to these documents, Mr. Weisberg also received between 15,000–20,000 field office files pursuant to the stipulation. Appellant's Reply Br. 13. In addition, he received indices

to the Memphis Field Office files, pursuant to the District Court's order of August 15, 1979. R. 124. He further received 6,500 of the FBI's abstract cards, which are similar to the indices to the field office files. JA 574.

Finally, as we noted previously, appellant also had previously received documents in response to his April 15, 1975 request. See supra text accompanying note 6 & note 6.

**9.** The stipulation provided as follows:

It is hereby stipulated by and between counsel for the parties, that upon Federal Bureau of Investigation's representation to the Court herewith, that processing of the FBI Memphis Field Office files pertaining to "the Invaders," the Sanitation Workers Strike, James Earl Ray, and the MURKIN file is undertaken immediately by defendants, and will be completed by October 1, 1977; that defendants will provide a worksheet inventory of the released documents; that processing of MURKIN files from the FBI field offices in Atlanta, Birmingham, Los Angeles, New Orleans, and Washington, D.C., as well as the processing of files relating to John Ray, Jerry Ray, James Earl

ulation that if the Department complied with its terms, he would forgo filing a motion under *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Subsequent to entering into the stipulation, the Department processed Mr. Weisberg's request in accordance with the agreed-upon timetable, and in consequence, Mr. Weisberg received an additional 15,000 pages of documents. *See supra* note 8.[10]

Despite receiving approximately 60,000 pages of documents, Mr. Weisberg continued to assert that the Department had not adequately searched its files. He also contended that the Department improperly withheld material in documents that had been processed. In particular, he contended that the various field office files had not been fully disclosed and should have been reprocessed; that he should be furnished with the indices to the FBI Memphis Field Office files, R. 101; and that various components of DOJ should have been searched. He further claimed that an inadequate search had been conducted with regard to the so-called "Long tickler" file, a temporary file of various Murkin documents maintained by FBI Special Agent Long,

who was assigned to the assassination investigation. R. 135.[11]

On February 26, 1980, the District Court ruled that the Department's search was adequate. JA 477. Despite this clear-cut ruling, Mr. Weisberg nonetheless sought further searches and reprocessing of documents already furnished to him. The litigation thereafter shifted to the issue of the Department's use of exemptions to excise certain material from disclosed documents. Acting on appellant's motion, the District Court ordered a *Vaughn* index of every two hundredth document. The court later ordered a supplemental *Vaughn* index when the first index produced a large number of pages containing no excisions, in order to evaluate the propriety of DOJ's claimed exemptions. Transcript of Hearing, Feb. 26, 1980, at 52–56; Transcript of Hearing, Aug. 15, 1980, at 6–8. In a memorandum decision issued December 1, 1981, the District Court conditionally granted the Department's motion for summary judgment, upholding all of the claimed exemptions. JA 572. On January 2, 1982, the District Court ruled that the Department had met all specified conditions. JA 604. The District Court later declined to reopen the litigation on the merits of the case. Order, June 22, 1982, JA 611.

Ray, Carol and Albert Pepper in the Chicago and St. Louis field offices MURKIN files, will be completed by November 1, 1977; that duplicates of documents already processed at headquarters will not be processed or listed on the worksheets, but attachments that are missing from headquarters documents will be processed and included if found in field office files as well as copies of documents with notations; that releases of documents and accompanying worksheets will be made periodically as they are processed; that administrative appellate review of the documents will take place prior to their release; that in the course of this processing all exemptions will only be assessed in strict conformance with the May 5, 1977, guidelines of Attorney General Griffin Bell relating to the Freedom of Information Act, and the provisions of the Freedom of Information Act itself; that in consideration of the foregoing commitment by the FBI and the Department of Justice, plaintiff will hold in abeyance filing a motion to require a *Vaughn v. Rosen* showing with respect to the foregoing FBI files, including the Headquarters' files already processed;

and further that, upon defendants' performance of these commitments by the specified dates, plaintiff will forego completely the filing of said motion; that plaintiff will hold in abeyance objections to specific deletions until the target dates specified above have passed, with the clear understanding of both parties that plaintiff has not waived his right to contest specific deletions after the passing of these dates.

10. In addition, Mr. Weisberg moved for a waiver of all search fees and copying costs, R. 52, arguing that the public interest in the case warranted such a waiver. *See* 5 U.S.C. § 552(a)(4)(A). The District Court ordered the Department to reconsider and explain its decision not to waive fees entirely, but instead to reduce the charges. JA 292–93. Ultimately, the Department waived the fees and costs. Affidavit of Quinlan J. Shea, JA 298–300.

11. In addition to these principal complaints, Mr. Weisberg raised numerous other objections that we will not recount here. *See, e.g.,* Transcript of Hearing, Feb. 26, 1980.

## B

In the midst of all these disputations over the completeness of FOIA disclosures, the Department during late 1977 and early 1978 considered entering into a consultancy arrangement with Mr. Weisberg. The goal of this contemplated arrangement was to clarify the exact nature of appellant's manifold objections to the disclosure process and the results thereof.[12] The discussions between Mr. Weisberg and Department officials in this respect began on November 11, 1977, and included a meeting between the parties with the District Judge in chambers. Affidavit of James H. Lesar, JA 311–18. Although Mr. Weisberg did not agree at that time, *id.*, he did correspond with various Department officials concerning the alleged agreement. *Id.* Further, it is undisputed that the parties engaged in discussions concerning the hourly rate to be paid. There is vigorous dispute, however, as to whether the Department offered to pay Mr. Weisberg $75 per hour. *Id.* The parties again met with the court in chambers to discuss the arrangement. Transcript of Hearing, May 24, 1978. Finally, after delivering two reports to the Department, Mr. Weisberg submitted a bill for $15,000 as well. Plaintiff's Memorandum Re Consultancy, Exhibit 1, JA 419. Faced with this request, the Department ardently maintained that no consultancy had ever been entered into and therefore rejected Mr. Weisberg's demands for payment at an hourly rate of $75.[13] Defendant's Memorandum in Opposition to Motion to Pay Consultancy Fee, Exhibit A, JA 614. It is undisputed that no written contract was ever reached.

Appellant filed a motion for payment of the consultancy fee on May 29, 1979. R. 94. The District Court, after deferring judgment on the issue and at one point granting the motion,[14] ultimately denied appellant's motion. Memorandum Opinion, Jan. 20, 1983. JA 733–36. The court concluded that no contract had ever been formed, because the parties did not agree on material terms. The court also refused to imply those terms. *Id.* In a subsequent decision, the court rejected appellant's theories of recovery based on promissory estoppel and equitable estoppel. Memorandum Opinion, April 29, 1983, JA 877–83.

## C

Now the final issue: in June 1979, Mr. Weisberg moved for summary judgment on the issue whether he had substantially prevailed for purposes of obtaining attorneys' fees under 5 U.S.C. § 552(a)(4)(E). After deferring as premature any ruling on the motion on August 13, 1979, JA 440, the District Court ruled in 1981 that Mr. Weisberg had substantially prevailed. Memorandum Opinion, Dec. 1, 1981, JA 585. Appellant moved for $267,516 in attorneys' fees and costs. Affidavit of James H. Lesar, JA 636–69. The Department opposed the motion on several grounds, but the District Court awarded $93,926.25 in fees and $14,481.95 in costs. JA 722. The

---

**12.** Although the parties vigorously contest the facts concerning Mr. Weisberg's alleged consultancy agreement, there is no dispute that the parties discussed such an arrangement. Also in hot dispute is the exact form of the work product the Department wanted Mr. Weisberg to produce. *Compare* Affidavit of Lynne Zusman, JA 308 *with* Transcript of Hearing, June 26, 1978.

**13.** The Department did represent that it "is prepared to discuss with Mr. Weisberg a consultancy fee of thirty ($30) dollars per hour for the work he has performed to date." Report to the Court, JA 306–07.

**14.** The District Court deferred ruling on the issue in an order dated July 6, 1979, JA 439, and at a subsequent hearing. Transcript of Hearing, Nov. 28, 1979, at 3. JA 452. In a memorandum opinion, the District Court, in granting the Department's motion for summary judgment, also addressed the consultancy motion. The court ordered the Department to pay the fee and found that $75 per hour was a reasonable rate. JA 572. The Department moved for reconsideration, but the court denied that motion. JA 604. When appellant moved for an order compelling payment, the Department argued that no contract existed, and that even if one did, the District Court lacked jurisdiction over the claim because it exceeded $10,000. The District Court then permitted additional discovery on the fee issue and ultimately, as noted above, reversed its decision on the consultancy arrangement.

court reasoned that because (1) Mr. Weisberg had substantially prevailed, (2) the suit had benefited the public, (3) and Mr. Weisberg derived no commercial benefit from the disclosure, an award of attorneys' fees was proper. *Id.* The District Court then computed the award at $75 per hour and deducted seven hours out of 791.9 hours. The "lodestar" award was thus $62,617.50, which the District Court increased by granting a fifty percent "risk" premium. *Id.* The court deducted $2,000 for excessive copying costs and long distance calls from appellant's $16,481.95 claim for costs. Memorandum Opinion, April 29, 1983, JA 881–82.

These appeals followed.

## II

### A

On appeal, Mr. Weisberg argues that the District Court erred in granting summary judgment to the Department on the adequacy of its search and the propriety of its withholdings. First, he contends that the scope of the Department's search was unreasonably limited, that the FBI withheld many of the so-called "field office files" as previously processed, and that the Department failed adequately to search for certain specified documents. Appellant's Brief 33–37. Second, he argues that the Department improperly withheld and excised information from those documents which it did disclose and that the two *Vaughn* indices were inadequate. *Id.* at 37–39. Despite Mr. Weisberg's numerous complaints with respect to the Department's disclosures, we reject each of these arguments and affirm the District Court's grant of summary judgment.

### 1

 As this court made clear in its recent decision in another of Mr. Weis-

berg's FOIA suits, the standard is well established for granting an agency summary judgment as to its claim of compliance with FOIA disclosure obligations. To meet its burden to show that no genuine issue of material fact exists, with the facts viewed in the light most favorable to the requester, the agency must demonstrate that it has conducted a "search reasonably calculated to uncover all relevant documents." *Weisberg v. Department of Justice,* 705 F.2d 1344, 1350–51 (D.C.Cir.1983). Further, the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate. Id.* at 1351 (citing *Perry v. Block,* 684 F.2d 121, 128 (D.C.Cir. 1982) (per curiam)). The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case. *Id.* (citing *McGehee v. CIA,* 697 F.2d 1095, 1100–01 (D.C.Cir.1983) *modified on petition for rehearing in other respects,* 711 F.2d 1076, 1077 (D.C.Cir.1983)). In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith. *Id.* (citing *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1979) (per curiam), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980)). With the guiding principle of reasonableness in mind, we turn to each of appellant's contentions.

The District Court issued its "Finding as to Scope of Search" on February 26, 1980, holding that the Department was entitled to summary judgment on that issue. JA 477. The District Court expressly found that a "proper and good faith search has been made for all items responsive to plaintiff's request in the FBI headquarters' Murkin files and in all files of the FBI field offices, with the exception of the Frederick residency." *Id.*[15] Mr. Weisberg's primary

**15.** The exception to this finding—the "Frederick residency"—mentioned by the District Court apparently refers to the FBI's search efforts to locate two photographs of a suspect provided by Mr. Weisberg to an FBI agent. Mr. Weisberg believed the photographs to be located at the

Frederick residency, which is part of the FBI's Baltimore Field Office. *See* Transcript of Hearing, February 26, 1980, at 31–35. No argument is pressed by appellant that the DOJ's search was inadequate for this reason. Thus, this as-

contention is that this determination is erroneous. Mr. Weisberg argues that the search was inadequate because (1) it was "unreasonably limited," (2) the FBI's procedures for processing the various FBI field office files were improper, and (3) certain files of individuals were not adequately examined. Appellant's Brief 21–23, 33–37. We address each of these arguments in turn.

First, appellant generally argues that the search was unreasonably limited because the FBI and the Department attempted to restrict the search to the Murkin files. In support of this contention, Mr. Weisberg argues that the Department failed to meet its burden by refusing to search the "individual items of Weisberg's December 23, 1975 request" as well as two particular components of the Department, the Office of Legal Counsel (OLC) and the Community Relations Service (CRS).[16] Further, Mr. Weisberg argues that the Department did not search what he calls the FBI's "divisional files."

■ We are fully persuaded, however, that the search efforts of the Department and the FBI were entirely reasonable and adequate. At the outset of this branch of our inquiry, it must again be borne in mind that Mr. Weisberg received approximately 60,000 documents. The Department submitted numerous, extremely detailed, non-conclusory affidavits in support of its motion for summary judgment on the scope issue. *See, e.g.,* Affidavits filed in support of Defendant's Motion for Partial Summary Judgment, May 14, 1979, R. 128, R. 187; Affidavit of Douglas F. Mitchell, JA 403–08; Fourth Affidavit of Janet L. Blizard, JA 561–69; Affidavit of Salliann M. Dougherty, JA 565–69. Despite Mr. Weisberg's repeated attacks on the integrity of the Department's affidavits, they cannot seriously be challenged as having been made in bad faith. Moreover, our review of the voluminous record in this case demon-

strates that the District Court repeatedly required the Department to undertake searches at appellant's request.

In the face of these detailed affidavits and the record in this case, Mr. Weisberg levels only speculative assertions that other documents exist or were not located in the numerous searches which were in fact conducted by the Department and the FBI. His general contention that the FBI tried to limit the search to its Washington, D.C. headquarters' Murkin files is, as the record clearly demonstrates, patently without foundation. As Mr. Weisberg himself points out as to the attorneys' fees issues, the FBI, pursuant to the parties' stipulation, searched and disclosed approximately 15,000 pages of documents from the Memphis and other FBI field offices. Many of these documents were *not* from the headquarters' Murkin files. Rather, the documents came from FBI field offices, files concerning "the Invaders," the "Memphis Sanitation Workers Strike," and James Earl Ray. Mitchell Affidavit, JA 403–04. Moreover, the Department searched the files of the Attorney General and the Deputy Attorney General pursuant to a District Court order, and did not locate any responsive materials in the course of that search. Order of Sept. 11, 1980, JA 523; Affidavit of Quinlan J. Shea, R. 1987. Nor is the Department's effort in this respect flawed simply because it did not search the "individual items" of the request. As this court has recognized repeatedly, "an agency is not required to reorganize [its] files in response to [a plaintiff's] request." *Goland v. CIA,* 607 F.2d 339, 353 (D.C.Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). The FBI's files on the King assassination investigation clearly were not organized along the lines of Mr. Weisberg's request; rather than treat the twenty-eight individual requests separate-

---

pect of the District Court's order is not at issue in the present appeals.

**16.** Mr. Weisberg has withdrawn from the appeal a challenge to the Department's refusal to

search another component, the Internal Security Division (ISD). Transcript of Oral Argument, May 8, 1984, at 6–7.

ly, the FBI reasonably chose to disclose the *entire* Murkin files to Mr. Weisberg.

Appellant's contention that the files of two individual components of the Department, OLC and CRS, should have been searched fares no better. Mr. Weisberg has utterly failed to rebut the Department's showing of adequacy by coming forward with evidence to suggest that responsive documents might be found there. The only "evidence" he proffers in this respect is that a letter from a writer requesting an interview regarding the investigation was located in a file other than a Murkin file. As shown above, however, there can no longer be any dispute in this case that *some* materials sought by Mr. Weisberg were not located in the Murkin file. This example, however, in no way suggests that these *particular* components of DOJ contain responsive materials. The Department's detailed affidavits stating that it has no reason to believe materials will be found in those components withstand Mr. Weisberg's generalized attack. Therefore, in the absence of such evidence, we decline to require the Department to search OLC and CRS files.

We also reject the contention that the search was unreasonable because the FBI did not search its "divisional files." [17] Appellant claims that he has proof that unsearched files do indeed exist. The support for this claim, however, consists of an affidavit submitted by Mr. Weisberg himself, stating that information which he received in his FOIA action for the JFK assassination records indicates that such divisional files exist. JA 423–24. No further support is provided. In contrast, the Department submitted an affidavit that sets forth in a detailed and nonconclusory fashion both (1) that these carbon copy (or "divisional") files are destroyed after a brief

period and (2) that although Department officials searched for other divisional files, reorganizations of these divisions and their files of the FBI prevented location of those particular files. Affidavit of Martin Wood, JA 472–74. In sum, Mr. Weisberg's general contention that the search was unreasonably limited and that various other files should have been searched fails in the face of the Department's more than adequate showing that it conducted a good-faith effort to locate responsive materials. The search was quite plainly "reasonably calculated to uncover all relevant documents." *Weisberg v. Department of Justice, supra*, 705 F.2d at 1351.

Appellant's second major argument with respect to the adequacy of the search is that the District Court should have ordered reprocessing of the entirety of the FBI's field office files. He argues that evidence from another of Mr. Weisberg's FOIA suits, in which he requested information on the JFK assassination, shows that the FBI's method of processing field office files was inadequate and that duplicative documents with notations were not provided. Appellant's Brief 36–37. We note that this is not the first time appellant has attempted to utilize evidence developed in one of his FOIA actions in another action. *See Weisberg IV, supra*, 705 F.2d at 1361–62. Here, however, as in *Weisberg IV*, the argument fails. The fact that the FBI's Dallas Field Office, in processing files in response to appellant's request concerning the assassination of President Kennedy, erroneously failed to provide some 2,000 nonduplicative documents in no way casts doubt on the FBI's methods of searching the Murkin files of other FBI field offices. This feeble evidence drawn from other litigation scarcely creates a genuine issue of material fact when contrasted with the Department's specific affidavits on this issue.

---

**17.** One such divisional file, the "Long tickler" file, which was a file of duplicates of Murkin documents temporarily maintained by FBI Special Agent Long, was disclosed, at least in part, to appellant. At oral argument, Mr. Weisberg withdrew that portion of the appeal. Transcript of Oral Argument, May 8, 1984, at 6–7. We pause here to note, however, that appellant's

brief is exceedingly vague, with the exception of the Long tickler file, concerning his complaints about *other* divisional files. *See* Appellant's Brief 22, 36. We assume, nevertheless, that he refers to the alleged divisional files referenced at the hearing on February 8, 1980. *See* Transcript of Hearing, February 8, 1980, at 40–41.

Affidavit of John Phillips, Defendant's Motion for Summary Judgment, R. 187.[18] We therefore reject appellant's invitation to order mammoth reprocessing of some 15,000 pages of Field Office files.

Appellant next argues that reprocessing is required, inasmuch as he was not provided with duplicates of documents containing notations already furnished to him from the headquarters' Murkin files. The District Court rejected this contention, finding that this request would have violated the explicit terms of the August 1977 stipulation. That stipulation provided, as we have seen, that "duplicates of documents already processed at headquarters will not be processed and included if found in field offices as well *as copies of documents with notations*," JA 268 (emphasis added). As the Department notes, and the record bears out, *all* the field office documents have *some* notations on them, e.g., routing stamps. The stipulations, therefore, must be read with this fact fully in mind. The FBI reasonably provided only documents with *substantive* notations. The effect of requiring reprocessing of all field office files containing *any* notation would plainly nullify the stipulation's provisions. The District Court therefore properly credited the Department's affidavits on this point and refused to require reprocessing of the field office files on this ground.

Finally, Mr. Weisberg's concluding contention with respect to the scope and adequacy of the search is that the FBI wrongfully refused to search the separate individual files of the numerous persons listed in appellant's December 23, 1975 request. *See supra* note 5. Appellant's Brief 33–36.[19] The Department has maintained throughout this litigation that searches of the files of *individuals* would implicate serious privacy concerns under exemption 7(C), and it therefore concededly has not searched these individual files. More to the point, however, the Department consistently has interpreted, with appellant's knowledge, the request as pertaining to its files on the King assassination, rather than to individual files, if such files do in fact exist. We believe this interpretation was entirely reasonable in light of the circumstances of this case. The December 23, 1975 request from Mr. Weisberg sought access to twenty-eight categories of information "pertaining to the assassination of Dr. Martin Luther King, Jr." *See supra* note 5. The Department has consistently maintained that information concerning the King assassination would be found in its Murkin files. *See, e.g.,* Transcript of Hearing, June 30, 1977, JA 267.[20] Thus, as discussed above, the FBI treated Mr. Weisberg's FOIA request as a request for processing the entire Murkin files; furthermore, the Department always maintained

**18.** This issue arose pursuant to appellant's Motion to Compel Disclosure of Field Office Files Withheld as Previously Processed, November 14, 1980, R. 184. This motion was one of a flurry of motions filed subsequent to the District Court's February 26, 1980 Finding as to Scope of Search. JA 477. *See, e.g.,* R. 167 (seeking reprocessing of entirety of Murkin files); R. 183 (seeking further search of individual files of names listed in second request); R. 189 (seeking further search of materials involved in neutron activation testing); R. 190 (seeking further search for Long tickler file); R. 194 (seeking further disclosure of Civil Rights Division files); R. 203 (seeking disclosure of index compiled by CRD in course of responding to appellant's requests); R. 210 (seeking disclosure of Field Office files inventories). The District Court granted many of these requests, Memorandum Opinion, Dec. 1, 1981, JA 572–84. It nevertheless declined to order "mammoth reprocessing" of the Field Office files. *Id.* at 575.

**19.** Although Mr. Weisberg's brief is extraordinarily vague on what these "certain items" are, it became clear at oral argument that the brief was referring to these particular requests. Transcript of Oral Argument, May 8, 1984, at 10–11. Further, the parties submitted supplemental briefs on this issue which we have fully considered in our resolution of this issue. We also note that at oral argument appellant dropped this aspect of the appeal insofar as it refers to Raul Esquivel and J.C. Hardin. *Id.* at 6–7.

**20.** To be sure, the Department did in fact disclose information concerning, for example, the Invaders, and the Memphis Sanitation Workers Strike, but it did this pursuant to the August 1977 stipulation, JA 268–69, in order to preclude a *Vaughn* motion by Mr. Weisberg and in order to end the disputes between the parties as to the scope of the Department's duty to search.

that information pertinent to the individuals listed in his request and to the King assassination investigation would be located in the FBI's Murkin files.

We believe that the FBI and the Department reasonably interpreted the request to include information about these individuals as related to the Murkin files and not to individual files, if any exist. First, as shown above, the request itself was framed in this manner. Second, the stipulation is indicative of this understanding, in that absolutely no mention of searching individual files is made. Third, the parties conducted this litigation consistently with this understanding for almost five years before Mr. Weisberg's objections finally came to the fore in November 14, 1980, some nine months *after* the District Court entered its February 1980 finding as to the scope of the search. Moreover, no mention of this issue was made in the papers and oral argument on the summary judgment motion. The tardiness of Mr. Weisberg in raising this issue clearly prevented its adequate resolution by the District Court. Given the long standing interpretation of this request in this litigation, we are fortified in our view that the FBI's interpretation was a reasonable one:[21] The District Court properly refused to reopen the issue in response to appellant's eleventh-hour motion and to modify the scope of the request. In view of our conclusion that the individual files were not within the scope of the December 23, 1975 request as the parties interpreted it, we need not address the issue of privacy waivers as they relate to disclosure of individual files to third party requesters.[22]

In sum, we affirm the District Court's grant of summary judgment concerning the adequacy of the Department's search. We reject each of Mr. Weisberg's contentions that the search was unreasonably limited, that the field office files should have been reprocessed, and that the FBI wrongfully failed to search any individual files as listed in the December 23, 1975 request. The Department conducted a search reasonably calculated to respond to Mr. Weisberg's request, and he in turn has raised no genuine issue of material fact with respect to the adequacy of that search.

2

Appellant's second line of attack on the grant of summary judgment below is that the Department's claims of exemption were improper and that the District Court accordingly erred in upholding them. First, he argues that the sampling procedure utilized for the *Vaughn* index was defective because it did not include samples of "all of the kinds of exemption claims made." Appellant's Brief 37–38. Second, appellant argues that the District Court erred in upholding the Department's use of FOIA exemptions 7(C) and 7(D). We address each of these arguments in turn.

Again, we must bear in mind the circumstances of this case. In response to his FOIA requests, Mr. Weisberg has received almost 60,000 pages of documents. Given this magnitude of disclosure, the District Court clearly could not have undertaken a review of each of the documents from which the Department, pursuant to FOIA's

21. Indeed, at a hearing in which this issue was discussed, Mr. Lesar, counsel for Mr. Weisberg, even offered to stipulate to limiting these requests regarding individuals to the King assassination. Transcript of Hearing, April 6, 1981, at 58–59. We note that in this and other litigation, Mr. Weisberg has employed similar tactics of delay in raising objections. While the size of the request makes some delay understandable, we think that such delay was not justifiable, particularly when the issue of the scope of the search was expressly litigated and the District Court had decided the issue before Mr. Weisberg even brought the matter to the District Court's attention. Such tactics serve only to handicap the court and the opponent, and we expressly disapprove of them. Even when appellant did bring them to the attention of the court, it was only in the context of a flurry of motions dealing with myriad issues that for the most part had already been litigated. *See supra* note 19. See *Weisberg IV, supra,* 705 F.2d at 1355, for another example of Mr. Weisberg's propensity for delay in raising issues.

22. Thus, we have no occasion to consider the applicability of the Seventh Circuit's decision in *Antonelli v. FBI,* 721 F.2d 615 (7th Cir.1983), to the instant case.

**1490**

exemptions, excised material. Thus, as we have previously noted, the District Court required the Department to provide a sample index of every two hundredth page of responsive material under *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) (requiring agency to produce index specifying exemptions claimed and reasons for exemptions). Order, Feb. 26, 1980, R. 151. Because this approach resulted in an index with a sampling of a large number of pages with no excisions or deletions whatever, the District Court required a second *Vaughn* index consisting only of documents containing deletions. Order, Sept. 11, 1980, JA 523. In December 1981, the District Court granted the Department's Motion for Summary Judgment, ruling that the Department properly withheld information under exemptions 7(C), 7(D), 7(E), and (b)(1).[23] Memorandum Opinion, Dec. 1, 1981, JA 581–84. At the same time, the court required *in camera* submission of a number of documents withheld in their entirety. *Id.* On January 5, 1982, the District Court upheld the Department's withholding of those documents as well.

■ Appellant primarily complains that the sampling provided by the District Court's methodology did not provide examples of the Department's use of exemptions 3, 5, 6, and 7(F). Appellant's Brief 26, 38. However, we discern no error whatever in the District Court's decision to require sampling rather than examining each and every document on which challenged exemptions were claimed. The District Court ordered not one, but two *Vaughn* indices when the random sampling provided by the first index produced many documents with no ex-

cisions whatever. The second index in this case consisted of ninety-three documents totalling 400 pages. JA 581. The exemptions that Mr. Weisberg claims were not represented on the *Vaughn* indices are exemptions used in only two percent of the total documents disclosed. Thus, on its face, the procedure provided the District Court with an adequate sampling of the Department's use of exemptions. The sampling procedure is appropriately employed, where as here the number of documents is excessive and it would not realistically be possible to review each and every one. *See Vaughn v. Rosen*, 383 F.Supp. 1049, 1052 (D.D.C.1974), *aff'd*, 523 F.2d 1136 (1975); *cf. Ash Grove Cement Co. v. FTC*, 511 F.2d 815, 818 (D.C.Cir.1975) (sampling of documents for *in camera* inspection). There is no contention that the integrity of the *Vaughn* index is questionable, nor could there be in view of the fact that the sampling was random. *Cf. Lame v. Department of Justice*, 654 F.2d 917, 928 n. 11 (3d Cir.1981) (integrity of sample index questionable when government, rather than court, selects samples). In sum, we find no error in the District Court's use of the sampling procedure for the *Vaughn* index.

Appellant next contends, rather vaguely, that there were "many examples" of wrongful withholding.[24] Appellant's Brief 39. He apparently is referring to the Department's use of Exemptions 7(C) and 7(D). Specifically, with regard to the 7(C) exemptions, Mr. Weisberg claims that the names of Claude and Leon Powell were withheld, notwithstanding the fact that "their names had been released by the FBI in other documents and had been publicized on countless TV news stories and in the print media." Appellant's Brief 24. He

**23.** Mr. Weisberg apparently does not challenge the District Court's approval of the Department's use of exemption (b)(1). 5 U.S.C. § 552(b)(1) (1982) (exemption for classified information). Even if appellant were appealing this issue, however, he would be very unlikely to prevail in view of the Department's detailed affidavits and the weight accorded an agency's affidavits in support of a decision to withhold information on this ground. *See Ray v. Turner*, 587 F.2d 1187, 1194 (D.C.Cir.1978).

**24.** We take Mr. Weisberg's exceptions to the Department's use of these exemptions from the "Statement of the Case," rather than from the "Argument" section of Mr. Weisberg's brief. *See* Appellant's Brief 26–27. Thus, as we see it, Mr. Weisberg objects to the Department's use of Exemptions 7(C) and 7(D).

also argues that the FBI wrongfully withheld the names of FBI agents under Exemption 7(C). *Id.*

Exemption 7(C) permits an agency to withhold "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1982). At the outset, it is clear, as the District Court observed, that the records sought here were compiled for law enforcement investigatory purposes. The District Court concluded that the FBI properly withheld the "identities of persons investigated or interviewed, information about third persons appearing in the documents and the names of FBI Special Agents," relying primarily upon this Court's decision in *Lesar v. Department of Justice,* 636 F.2d 472, 486–88 (D.C.Cir. 1980). *See also Baez v. Department of Justice,* 647 F.2d 1328, 1338–39 (D.C.Cir. 1980). In *Lesar,* the court upheld the withholding of information almost identical to that withheld here. Specifically, this court concluded that, despite the fact that FBI agents are public officials, they have a "legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives." 636 F.2d at 487.

The great public interest in the tragic assassination of Dr. King did not outweigh the privacy interests at stake in *Lesar,* and we discern no reason for reaching a different conclusion here. The same privacy interests are at stake here as there; and, the same risk of harassment and annoyance as in *Lesar* would inhere in any release of agents' identities in this case.[25] In *Lesar,* we found that similar reasons justified the withholding of the names of those investigated, and third persons mentioned in the

documents. " 'Those who cooperated with law enforcement should not pay the price of full disclosure of personal detail.' " *Id.* at 488 (quoting *Lesar v. Department of Justice,* 455 F.Supp. 921, 925 (D.D.C.1978)).

■ As noted above, Mr. Weisberg claims that he knows the identities of two persons who gave information to the FBI, and that the names of those persons were also disclosed to the House Select Committee on Investigations. That is neither here nor there, however. The fact that Mr. Weisberg has apparently been able to piece together the manner in which the identities of these alleged informants fit in with the FBI's Murkin investigation in no way undermines the privacy interests of these individuals in avoiding harassment and annoyance that could result should the FBI *confirm* to Mr. Weisberg the presence of their names in the King documents. Release of such information to a member of the public interested in scholarly analysis and publication has the potential to result in greater dissemination than would release to an investigative committee of Congress. We therefore uphold the District Court's grant of summary judgment for the Department on the use of Exemption 7(C).[26]

■ Exemption 7(D) protects from disclosure

> investigatory records compiled for law enforcement purposes, but only to the extent that production of such records would ... disclose the identity of a confidential source, and in the case of a record compiled by a criminal law enforcement agency during the course of a criminal investigation ... confidential information furnished only by the confidential source.

5 U.S.C. § 552(b)(7)(D) (1982). Under this exemption, the FBI withheld information supplied by confidential sources and infor-

---

**25.** We of course observe, consistent with *Lesar,* that "this is not to imply a blanket exemption for the names of all FBI personnel in all documents." *Lesar, supra,* 636 F.2d at 487.

**26.** Mr. Weisberg has made no claim on appeal that the District Court lacked an adequate factu-

al basis for assessing the Department's use of exemptions. The Department's affidavits and the documents examined by the District Court *in camera* clearly provided such a basis for the court's determinations. *Cf. Lesar, supra,* 636 F.2d at 488.

mation supplied by local and foreign law enforcement agencies. As we held in *Lesar*, the confidential information supplied by foreign and local law enforcement agencies is clearly within the purview of Exemption 7(D). *Lesar, supra*, 636 F.2d at 488–91. Moreover, as the *Lesar* court observed, the availability of Exemption 7(D) depends not upon the factual contents of the document sought, but upon whether the *source* was confidential and the information was compiled during a criminal investigation. *Id.* at 492. The affidavits submitted by the Department clearly demonstrate the propriety of the FBI's use of this exemption. *See* Seventh Affidavit of Martin Wood, JA 478–90. We discern no error in the District Court's grant of summary judgment for the Department on the use of Exemption 7(D).[27]

In sum, we uphold the District Court's grant of summary judgment on the various exemption claims. Appellant has pointed to nothing whatever that calls into question the propriety of the Department's use of those exemptions.

**B**

We turn now to the second of Mr. Weisberg's three major contentions on appeal. Appellant claims that he and the Department entered into a consultancy agreement for the purpose of his specifying with greater precision the deletions with which he took issue, in order to aid the Department in the resolution of the FOIA disclosure issues. Specifically, he claims that the Department, through Ms. Lynne Zusman, a DOJ attorney, offered him $75 per hour for this work and that he accepted the offer. Mr. Weisberg also asserts that he in fact completed the contemplated task, and that he submitted reports to the Department from which the Department benefited. Mr. Weisberg submitted a claim for payment of approximately $16,000, including costs, and sought an order from the District Court compelling the Department to pay that fee. The Department objected, contending that no contract had ever been entered into and that such material terms as the rate of compensation, the duration, and the precise nature of the work product were never agreed upon.

After initially granting appellant's motion,[28] the District Court ultimately agreed with the Department and held that no contract was formed by virtue of the parties' failure to supply a material term, namely the amount of time to be spent on the project. Memorandum Opinion, Jan. 20, 1983, JA 134–35; Memorandum Opinion, April 29, 1983, JA 880. The court also refused to imply a contract-in-fact by supplying the missing terms, reasoning that "plaintiff should reasonably have realized that further terms needed to be agreed upon before proceeding with the consultancy work," and that "the defendant did not use plaintiff's work and thus derived no benefit from it." JA 735–36. The court

---

**27.** Although Mr. Weisberg's brief is vague on exactly which exemptions he objects to, *see supra* note 25, for the sake of completeness, we deal briefly with some complaints specified only in the section of his brief styled "Statement of the Case."

First, Mr. Weisberg appears to argue that the Department improperly excised, pursuant to Exemption 7(E), which protects from disclosure law enforcement investigatory techniques and procedures, information regarding "Document 91." He argues that the law enforcement techniques described in that document are already well-known. Mr. Weisberg asserts that such techniques included wiretapping, bugging, and mail interception. As the Wood Affidavit explains, however, the technique used during the interview that is the subject of Document 91 is still in use today. To release the particular technique, in the context of that particular investigation, would obviously undermine its use in other similar circumstances. We do not think that the exemption for law enforcement techniques can be read so narrowly.

Second, appellant apparently contends that the Department erred in dropping a number of exemption claims. Appellant's Brief 26. We discern absolutely no error on the part of the Department in dropping claims under exemption (b)(1), when declassification made the documents disclosable. *See* MacDonald Affidavit, JA 525; Second MacDonald Affidavit, JA 556. Nor do we detect any error in DOJ's dropping exemptions under 7(A), since those claims were dropped when the proceeding at issue was no longer pending.

**28.** *See supra* note 14.

further declined to award recovery in *quantum meruit* for the same reasons. JA 736. Finally, in a later opinion, the District Court rejected appellant's argument that the Department should have been required to pay the fee on promissory and equitable estoppel theories. JA 887–90.[29]

■ We agree with the District Court that no contract, either express or implied in fact, was ever entered into by the parties here. It is, of course, elementary that in order to create an enforceable contract, the parties must manifest their mutual assent. *See Restatement (Second) of Contracts* § 3 (1977). The facts of this case clearly indicate that no contract was formed because the terms of the contract were not "reasonably certain." *Id.* § 33. In this case, no written contract was ever executed. But what is more, the District Court specifically found, after carefully examining the evidence, that the parties never agreed upon the duration of the consultancy, the court thus quite reasonably concluded that an agreement on that term was essential "because the total cost would depend primarily upon it." JA 735. Mr. Weisberg does not contest the fact that the parties did not agree on the duration of the alleged agreement. Rather, he argues that the duration, and thus the total cost of the contract, was not an essential term, and that the parties did not agree on that term

because they could not predict the length of time it would take Mr. Weisberg to perform the contemplated services. Appellant's Brief 40.

We conclude that the District Court's finding as to the materiality of this term was entirely correct. The course of negotiations between appellant and the Department, which undisputably focused upon the amount of compensation to be paid, reveals the materiality of this term. It strains credulity to believe that the Department could have agreed to appellant's spending an unlimited amount of time on the project, especially in view of the nature of the elaborately regulated government contracting process. We therefore agree with the District Court that, under settled principles of the law of contract, the absence of agreement by the parties on a material term prevented the formation of a legally enforceable contract. 1 *Corbin on Contracts*, § 95, at 394 (1963 & Supp.1984); *Restatement (Second) of Contracts*, § 33 (1981) ("the fact that one or more terms ... are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance").[30]

■ Appellant next argues that, notwithstanding the absence of a contract, he is entitled to an award based on principles of quasi-contract or contract implied-in-law. *See* 1 *Corbin on Contracts*, § 95,

---

29. The District Court properly exercised jurisdiction over appellant's claim pursuant to 28 U.S.C. § 1346(a)(2) (1976 & Supp. V 1981), since Mr. Weisberg waived his right to recover the amount in excess of $10,000. Memorandum Opinion, April 27, 1980, JA 877; Memorandum Opinion, Jan. 20, 1983, JA 734.

30. Because we agree with the District Court that the term as to duration was an essential term of the proposed consultancy, we need not address the Department's contentions that other material terms were also missing. Accordingly, we do not consider whether the Department, through Ms. Zusman, ever actually offered appellant $75 per hour, as Mr. Weisberg claims, or whether the only offer extended to him was $30 per hour. We note that the District Court appeared uncertain about this issue, finding somewhat ambiguously that it was "more likely than not" that Ms. Zusman in a conversation with appel-

lant's counsel in March 1978 offered to pay Mr. Weisberg $75 an hour. JA 879. In any event, we note that the District Court expressly found that "further terms needed to be agreed upon before proceeding with the consultancy work," JA 736, and that there appears to have been a basic misunderstanding about the work product the Department wanted, with DOJ maintaining that it wanted Mr. Weisberg to produce a list of deletions that he contested, but with appellant actually producing two very lengthy narrative reports. Thus, even were we to agree with Mr. Weisberg that duration was not a material term, we would still have difficulty finding the existence of an enforceable contract in view of the numerous areas of uncertainty revealed by the record. Finally, in view of our resolution of this issue, we need not address the Department's other grounds for affirming the District Court. *See* Appellee's Brief 37 & n. 14.

at 407–08 (1963 & Supp.1984). Under settled principles, such restitutionary relief is available when no contract has been formed because of indefiniteness of terms, and the party has in good faith, believing that a contract existed, performed part of the services promised in reliance on that belief. In this respect, it is clear that Mr. Weisberg produced two reports and provided them to the Department. Appellant earnestly contends that those reports were prepared specifically within the compass of the alleged consultancy agreement. Nonetheless, as the District Court held, appellant should have realized that additional terms had to be agreed upon before a binding contract could be formed. JA 735–36. This finding is not clearly erroneous. Further, jurisdiction as to contract claims against the United States under the Tucker Act extends only to actual contracts, either express or implied-in-fact; it does not extend to contracts implied-in-law. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980); *Narva Harris Constr. Corp. v. United States*, 216 Ct.Cl. 238, 574 F.2d 508, 511 (1978).

Similar reasons compel the identical conclusion with respect to appellant's theories of promissory and equitable estoppel. First, as we have only recently observed, "there has been much controversy concerning when an estoppel will run against the government." *National Juvenile Law Center v. Regnery*, 738 F.2d 455 at 459 (D.C.Cir.1984) (citing *Heckler v. Community Health Services of Crawford County, Inc.*, —— U.S. ——, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984)). Assuming *arguendo* that promissory estoppel or equitable estoppel is available against the Government, it is nonetheless clear that these doctrines require the element of reasonable reliance. *See Restatement (Second) of Contracts*, § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if the injustice can be avoided only by enforcement of promise."); *Heckler, supra*, 104 S.Ct. at 2223 ("the party claiming estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have been reasonable ....") (citations omitted).

The District Court found that "Mr. Weisberg did not act reasonably in proceeding with work on the consultancy agreement." JA 878. The court based this conclusion on (1) the history of the negotiations, (2) the correspondence between the parties on the consultancy, and (3) on the fact that Mr. Weisberg did most of the work on the consultancy *before* March 1978, the time when he contends the offer of $75 per hour was made. *Id.* at 878–79. As if more were needed, the District Court found that the Department did not obtain any benefit from the two narrative reports. *Id.* at 879.

▇▇▇ The District Court's findings in this regard do not even remotely approach the domain of "clearly erroneous." First, it is undisputed that Mr. Weisberg commenced his work on the reports long before the March 15, 1978 conversation between Ms. Zusman and Mr. Lesar. Second, the entire course of dealings between the parties—in particular, the disputes concerning the amount to be paid and the specific form of the work product to be produced—evidence sufficient uncertainty that appellant was on notice that further negotiations were necessary. Thus, he could not have *reasonably* relied on any promise or representation. Most important, as the District Court found, the Department in no way benefited from the Weisberg reports; DOJ did not receive the work product it had sought in the first instance and thus did not benefit from that which Mr. Weisberg did produce. We therefore decline, as did the District Court, to require payment of a consultancy fee on the basis of promissory or equitable estoppel.

C

Finally, we turn to the last of the three principal issues on this appeal, the District Court's award of $93,926.25 in attorneys'

fees and $14,481.15 in costs. The District Court ruled that appellant had substantially prevailed in this litigation, and that he was entitled to an award because (1) the public benefited from the disclosure, (2) appellant did not benefit commercially, (3) appellant's interest in the documents was scholarly in nature, and (4) the Department lacked a reasonable basis in law for its actions. Memorandum Opinion, Jan. 20, 1983, JA 720–25. The District Court then calculated the award on the basis of an hourly rate of $75 per hour. The court deducted seven out of 791.9 hours claimed by Mr. Lesar as having been spent on the merits of the case, excluded 44 hours for time spent on the consultancy fee, and 36.7 hours spent on the fee application. *Id.* at 26–27. The District Court then awarded a 50 percent premium on the lodestar award. *Id.* at 729–30. Finally, the District Court awarded $10,437.67 in litigation costs.

The Department challenges the attorneys' fees and costs award, arguing that appellant did not substantially prevail, and that even if it did, he is not entitled to an award under the four criteria enunciated in *Fenster v. Brown*, 617 F.2d 740, 742 (D.C. Cir.1979). *See* discussion *infra*, at 45. The Department also argues that an increase in the lodestar rate was unjustified and that appellant is unentitled to costs. Appellant argues, in contrast, that the District Court's decision should be upheld, except insofar as (1) he was awarded only $75 per hour, (2) time spent on the fee application was excluded, and (3) the lodestar rate was not adjusted to take account of delay in receipt of fees.

### 1

█ Section 552(a)(4)(E) permits a District Court to "assess against the United States reasonable attorneys' fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E) (1982). Whether an award of attorneys' fees is proper depends upon a two-step inquiry. First, the complainant must show that he or she is "eligible" for an award by demonstrating that he

or she substantially prevailed. But eligibility alone is not enough. Second, and equally important, the complainant must show that he or she is "entitled" to an award. *Church of Scientology of California v. Harris*, 653 F.2d 584, 587 (D.C.Cir.1981). *See* discussion *infra*, at 1498. Once it is determined that a complainant is entitled to attorneys' fees, the court must then calculate the award by multiplying the hourly rate and the number of hours expended on the litigation—the so-called "lodestar award." *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1323 (D.C.Cir.1982). Thereafter, the court may consider whether an adjustment in the lodestar rate is appropriate. *Id.* at 1328–29. Finally, the court may consider awarding "reasonable litigation costs." With this framework in mind, we turn to each of the elements of the District Court's award.

### 2

The District Court concluded that appellant had substantially prevailed in this FOIA litigation, stating simply that "[d]efendant has released over 50,000 pages to plaintiff in this lawsuit; there is no question that plaintiff has substantially prevailed." Memorandum Opinion, Dec. 1, 1981, JA 573–74. When DOJ requested reconsideration of this issue, the District Court reiterated this conclusion, stating that "[t]he record in this action reflects that defendant stonewalled plaintiff's request for more than a year after plaintiff filed this complaint. There is no question that the prosecution of this action was necessary and that the action had a substantial causative effect on the delivery of the information." Memorandum Order, Jan. 5, 1982, JA 605.

The Department challenges this determination, arguing, first, that the great majority of the approximately 60,000 pages released to Mr. Weisberg in response to his two administrative requests were released as a result of the *administrative* processing of his voluminous second request of December 23, 1975, which appellant conced-

edly brought into court before exhausting his administrative remedies.[31] Second, the Department contends that those documents that Mr. Weisberg concededly *did* receive by virtue of the litigation—tickler files, abstracts, indices, and index cards relating to the documents contained in the Murkin files—were either duplicative of or not responsive to his request, and were disclosed in an effort to end the matter once and for all. Appellee's Brief 40–41.

To evaluate the merits of this argument, we begin by noting the task before the District Court in determining whether a FOIA complainant has substantially prevailed. It is well established in this circuit that this inquiry is largely a question of causation. "[T]he party seeking such fees in the absence of a court order must show that the prosecution of the action could reasonably be regarded as necessary to obtain the information ... and that a causal nexus exists between that action and the agency's surrender of that information." *Cox v. Department of Justice,* 601 F.2d 1, 6 (D.C.Cir.1979); *Church of Scientology of California v. Harris, supra,* 653 F.2d at 587–88. Although an agency cannot prevent an award of attorneys' fees simply by releasing the requested information without requiring the complainant to obtain a court order, the mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation. *See Crooker v. Department of the Treasury,* 663 F.2d 140, 141 (D.C.Cir.1980) (per curiam).

The question whether an FOIA litigant has substantially prevailed is, of course, a question of fact entrusted to the District Court and the appellate court is to review that decision under a clearly-erroneous standard. *See Cox v. Department of Justice, supra,* 601 F.2d at 6; *Crooker v. Department of the Treasury, supra,* 663 F.2d at 142; *Sweatt v. United States Navy,* 683 F.2d 420, 425 (D.C.Cir.1982).

Nevertheless, it is equally well established that findings of fact derived from the application of an improper legal standard to the facts may be deemed by an appellate court to be clearly erroneous. *See United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); *FTC v. Texaco, Inc.,* 555 F.2d 862, 876 n. 29 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). *See also* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2585, at 733–34 (1971).

Applying these standards to the case at hand, it is evident that the District Court's determination that appellant substantially prevailed must be vacated. The District Court, as noted above, provided only the barest outline of the reasoning underlying its conclusion that Mr. Weisberg substantially prevailed. The District Court merely concluded that because Mr. Weisberg had obtained over 50,000 pages, he had substantially prevailed. This conclusion evidences no consideration whatever of several factors that this court expressly recognized in *Cox v. Department of Justice,* 601 F.2d 1 (D.C.Cir.1979). In *Cox,* we explained that the causation inquiry must take into account "whether the agency upon actual and reasonable notice of the request, made a good faith effort to search out material and to pass on whether it should be disclosed." *Id.* at 6. We further noted the relevance of such factors as the number of requests pending before the agency and the time-consuming nature of the search and decisionmaking process. *Id.* (citing *Open America v. Watergate Special Prosecution Force,* 547 F.2d 605 (D.C.Cir.1976)).

The District Court utterly failed, in evaluating the record in this case, to take account of these factors in concluding that appellant had substantially prevailed. Even a cursory review of the undisputed facts in the record indicates the strong

---

31. The Department apparently does not challenge the conclusion that appellant substantially prevailed with regard to his first request, by virtue of the fact that he received the TIME, Inc.

photographs as a result of the litigation. *See Weisberg v. Department of Justice,* 631 F.2d 824 (D.C.Cir.1980).

possibility that the Department disclosed the vast bulk of the materials sought in the second administrative request as a result of its *administrative* processing of the FOIA request. First, appellant filed his second administrative request on December 23, 1975, and then amended his previously filed complaint regarding the first administrative request the *very next day*. He therefore did not exhaust his administrative remedies by allowing the Department ten days within which to respond to the second request.[32] Appellant thus pretermitted the administrative stage of the processing of FOIA requests. Second, and more important, the District Court paid no heed to the Department's overwhelming backlog of FOIA requests, which this court had occasion to consider in *Open America*. In this case, it is clear beyond peradventure that appellant's request involved huge numbers of documents, as well as laborious and time-consuming reviews. Although no disclosures were made pursuant to the second request until October 1976, the delay apparently was due, at least in part, to the voluminous nature of the request, the limited resources of the Department, and the tremendous FOIA backlog faced at that time by DOJ. Further, once the disclosures began, they continued at a steady pace until completed in 1977. The suggestion that the Department "stonewalled" appellant's request must be viewed in light of Mr. Weisberg's litigation strategy—choosing to short-circuit the administrative process—and the Department's legitimate response to that strategy—a motion to stay for failure to exhaust. In sum, as to the overwhelming majority of documents re-

ceived by Mr. Weisberg during the pendency of this lawsuit, it is not at all clear from the record that the lawsuit actually caused the Department to release the documents or, conversely, whether the release was in reality pursuant to the administrative request.[33] Because the District Court failed to take account of the factors established by this court in *Cox*, we must vacate the District Court's award of attorneys' fees as clearly erroneous.

On remand, the District Court should consider the specific argument advanced by the Department that the bulk of documents that Mr. Weisberg did receive as a result of the litigation—the Long tickler, abstracts, indices, and index cards—were either duplicative or unresponsive to his requests. Some documents were released, DOJ argues, just to put Mr. Weisberg's incessant demands behind it once and all. Appellant, in contrast, relies heavily on these successes in urging that the District Court's causation determination be upheld.

Accordingly, the District Court should consider whether these disclosures justify a finding that appellant substantially prevailed as to his *overall* request. *See Goland v. CIA, supra*, 607 F.2d at 356 n. 103 (although FOIA plaintiffs need not obtain a judgment in court to be eligible for an award of fees, the plaintiffs must *"substantially* prevail") (emphasis in original). In particular, it appears that appellant obtained only thirty-four index cards from the Memphis Field Office. JA 440. Appellant also received abstract cards to the Murkin files pursuant to an oral court order. JA 470. Nevertheless, after the disclosure had already been made, the District Court

---

**32.** The District Court in March 1976 indicated that although the amendment of the complaint, which as amended brought in its sweep the vast majority of the documents sought in this litigation, might technically be subject to dismissal for failure to exhaust, she would permit appellant to refile, since over three months had passed and the ten day response period had also been superseded by the passage of time. JA 107. The District Court subsequently denied the Department's formal motion for a stay to permit it to process the voluminous request administratively.

**33.** We also detect some confusion on the part of the District Court regarding the first and second requests. As noted earlier, the Department does not challenge that appellant substantially prevailed in the litigation regarding the first administrative request. (It does however challenge the District Court's entitlement finding as to that request.) We further note in this regard that appellant began receiving documents responsive to his first request in April 1976. *See supra* note 8. On remand, the District Court should evaluate separately the Department's responses to each of Mr. Weisberg's two requests.

actually *denied* appellant's motion to compel production of these cards, stating that the abstracts are "essentially duplicative of information already released.... The abstracts reveal less information than the documents which plaintiff received." *Id.* at 574. Appellant also received the Civil Rights Division's index of documents, an index developed during the processing of his second request. *Id.* at 577–78. It is very difficult to discern how this index could have been encompassed in appellant's request, which had been formulated long before the index was even created. *See Cox, supra,* 601 F.2d at 6 (defendant must have had *actual* notice of request). This sampling of the types of documents received by appellant as a result of the litigation reveals that a much closer look at the results of the litigation is warranted before it can be concluded that appellant substantially prevailed.

We therefore remand the issue of the attorney's fees awards by the District Court for reconsideration of whether Mr. Weisberg substantially prevailed.

### 3

██ Even if a court concludes that a plaintiff in an FOIA suit has substantially prevailed, a further inquiry must be made into the entitlements of the plaintiff to a fees award. This inquiry entails a balancing of four factors: (1) the benefit of the release to the public; (2) the commercial benefit of the release to the plaintiff; (3) the nature of the plaintiff's interest; and (4) the reasonableness of the agency's withholding. *Church of Scientology, supra,* 653 F.2d at 590 (citing *Fenster v. Brown,* 617 F.2d 740 (D.C.Cir.1979)). The District Court concluded that all four criteria were met in the instant case, ruling that Mr. Weisberg's efforts had resulted in ·an increase in the amount of information available to the public, that Mr. Weisberg had derived no commercial benefit, and that his interest in the documents was loftily scholarly and journalistic. Finally, the court concluded that the Department lacked a reasonable basis for withholding the documents ordered to be disclosed. JA 720–25.

Inasmuch as we vacate and remand for reconsideration the District Court's conclusion that appellant substantially prevailed, we also remand to the District Court for consideration of the balance of factors under the entitlement analysis should the District Court conclude that appellant did indeed substantially prevail in this litigation. In particular, the District Court should reconsider whether the Department had a reasonable basis in law for its withholding. In analyzing this factor, we have noted, and the District Court has recognized, that there must be a showing that the "government had a reasonable basis in law for concluding that the information in issue was exempt and that it had not been recalcitrant or otherwise engaged in obdurate behavior." *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1366 (D.C.Cir.1979). Here, the District Court focused primarily on the adequacy of the Department's search efforts, rather than upon the information it withheld.

On remand, the District Court should first bear in mind that *all* of the Department's claimed exemptions were properly upheld. Second, the District Court should give adequate weight to the unique circumstances of this case—appellant's failure to exhaust his administrative remedies, the voluminous nature of his request, his frequent reformulations of his request, and the length of time obviously required to process such a large request. Third, as recounted above, many of the delays in this suit were unquestionably the appellant's own doing. He filed numerous, repetitive motions and sought unwarranted reprocessing of documents and repeated searches, most of which were to no avail. Plainly, simple justice requires that the Government not be penalized for delays it did not cause. Finally, we note that the District Court improperly considered the "repudiation of the consultancy agreement" in evaluating the Department's reasonable basis for withholding. Thus, on remand, should the District Court conclude that appellant is eligible for an award of attorneys' fees, it should also reconsider

whether he is entitled to such fees, bearing in mind that under FOIA, attorneys' fees are to be awarded in light of that Act's basic policy—"the encouragement of maximum feasible access to government information." *Nationwide Building Maintenance, Inc. v. Sampson,* 559 F.2d 704, 715 (D.C.Cir.1977).

4

In determining a fee award (after a court has concluded that an FOIA complainant is both eligible and entitled to an award), the District Court must next determine the hourly rate and the number of hours or "lodestar award." *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1323 (D.C.Cir.1982) (hereafter "NACV"). On remand, should the District Court determine that an award of fees is proper, it should reconsider the calculation of the lodestar fee in this case, taking into account the following factors. Under *NACV*, a prevailing FOIA plaintiff is not entitled to an attorneys' fees award for "nonproductive time or for time expended on issues on which plaintiff ultimately did not prevail." *Id.* at 1327. The District Court properly excluded the time spent on the unsuccessful consultancy fee issue and the excessive time spent on the fee application itself. The District Court, however, excluded only seven hours from the fees attributable to the merits of the case. On appeal, appellant candidly concedes that additional hours should have been deducted from his fee application. Appellant's Brief 57–58. Moreover, it is abundantly clear from our review of the record that appellant filed numerous nonproductive and repetitive motions on issues on which he ultimately did not prevail.[34] Although the District Court need not chronicle each and every event or activity in analyzing the attorney's nonproductive time, a considerably more careful distinc-

tion between productive and nonproductive time is required than was provided here.

5

The District Court also awarded a fifty percent "risk premium" on top of the lodestar rate, reasoning that this litigation was "unnecessarily prolonged" and that the outcome was "highly uncertain." JA 729–30. The Department argues that the award was completely unjustified, while appellant contends that it was not enough. On remand, should the court conclude that an award of fees is proper, it should also reconsider the upward adjustment awarded here in light of the Supreme Court's intervening decision in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

In *Blum,* the Court held that although an upward adjustment of the lodestar fee in a case under 42 U.S.C. § 1988 is permissible "in some cases of exceptional success," the plaintiff had made no such showing in that case. *Id.* 104 S.Ct. at 1549. The Court in reaching that conclusion analyzed the novelty and complexity of the issues, the quality of the representation, and the riskiness of the litigation. The Court found that despite the high quality of the representation there, and the fact that the litigation benefited a large class of persons, there was no support for the conclusion that the litigation was risky or involved novel theories. Finally, the Court indicated that such factors as the quality of representation, the results of the litigation, and the riskiness of the litigation will "ordinarily be subsumed within other factors used to calculate a reasonable fee." *Id.* Thus, the clear teaching of *Blum* is that courts should be cautious in adjusting the lodestar rate to avoid duplication of fee awards that have already been accounted for in the basic fee calculation.

---

**34.** There are many examples, too numerous to list here, of such nonproductive time in this litigation. Thus, the court should consider whether the time spent on the many motions listed *supra,* at note 18, resulted in success. Similarly, the court should consider appellant's fruitless challenges to the Department's use of exemptions, the numerous motions seeking re-

processing of both Murkin headquarters and field office files; and the motions for searches of various offices of the Department (including the Attorney General and the Deputy Attorney General). Although this listing is in no way exhaustive, it is meant to illustrate the types of nonproductive time clearly expended in the litigation of this case.

In this case, the District Court's unsupported conclusions that the riskiness of the litigation and the prolonged nature of the litigation justified the upward adjustment do not pass muster under the Supreme Court's decision in *Blum.* First, it does not appear that this litigation involved highly complex or novel issues, although the litigation was cumbersome and involved numerous issues. Thus, an upward adjustment of the award based on the risk factor would, under *Blum,* appear unwarranted. Second, the fact that this litigation was lengthy and time consuming provides no justification for an upward adjustment under *Blum;* the hourly rate awarded Mr. Lesar was based on present rates, rather than past rates, and adequately compensates him for time spent on this litigation. Further, much of the delay was not the fault of the Government. Similarly, we do not think that whether Mr. Lesar was prevented from taking on other cases as a result of this litigation can be a factor in the lodestar adjustment analysis. *See NACV, supra,* 675 F.2d at 1328–29 (listing factors).

In sum, the District Court on remand should reconsider the upward adjustment of the lodestar in light of this court's decisions in *NACV* and *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) (en banc) and the Supreme Court's decision in *Blum.*[35]

### IV

For the foregoing reasons, we affirm the District Court's grant of summary judgment to the Department on the adequacy of the search, the propriety of its use of the exemptions, and the absence of a consultancy fee arrangement. We vacate and remand for reconsideration of the award of attorneys' fees, with specific directions that the court consider whether appellant substantially prevailed and whether he is entitled to an award of fees. Should the court conclude that an award is appropriate, it should nonetheless exclude all nonproductive time and reconsider under *Blum* the appropriateness of an upward adjustment of the lodestar fee, as well as costs.

*It is so ordered.*

---

**35.** With regard to costs, the District Court obviously should reconsider that element as well. We note that the District Court properly excluded copying costs for excessively lengthy affidavits and deducted amounts expended for excessive telephone calls. The District Court should reconsider the award of costs in total, however, particular in view of any deductions from any fee award for nonproductive time.